Patrice MANDELLA, Plaintiff,

v.

Michael ASTRUE, Commissioner,
Defendant.

Case No. 10–C–659.

United States District Court,
E.D. Wisconsin.

Oct. 17, 2011.

William J. Roach, United States Department of Justice, Office of the U.S. Attorney, Green Bay, WI, for Plaintiff.

## DECISION AND ORDER

WILLIAM E. CALLAHAN, JR., United States Magistrate Judge.

### I. NATURE OF THE CASE

On August 3, 2010, Patrice Mandella ("Mandella" or "claimant") commenced this action, seeking judicial review of the Commissioner's final decision denying her benefits pursuant to 42 U.S.C. § 405(g).

The parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General L.R. 73 (E.D.Wis.).

## II. PROCEDURAL HISTORY

Mandella applied for supplemental security income ("SSI") and disability insurance benefits ("DIB") on July 20, 2006, with an onset date of April 1, 2000. (Tr. 14.) Mandella later amended her date of onset to July 20, 2006, and therefore, this appeal involves a claim for SSI only. (Tr. 14; Pl.'s Br. 1.) The Social Security Administration initially denied her application on January 2, 2007, and then denied her application upon reconsideration on May 15, 2007. (Tr. 14.) On June 27, 2007, Mandella filed a written request for a hearing, and on August 12, 2009, a hearing was conducted before Administrative Law Judge ("ALJ") Ronald G. Bernoski. (Tr. 14, 24–25.) On September 11, 2009, ALJ Bernoski denied Mandella's application. (Tr. 14–24.) On July 16, 2010, the Appeals Council denied Mandella's request for review, making the ALJ's decision the final decision of the Commissioner of Social Security. (Tr. 1–5.)

Mandella now seeks judicial review of the Commissioner's final decision to deny benefits pursuant to 42 U.S.C. § 405(g).

## III. BACKGROUND

This section includes a short summary of (1) Mandella's testimony; (2) Mandella's relevant medical record; (3) the testimony of the VE from the August 12, 2009 hearing; and (4) the ALJ's decision.

### A. Mandella's Testimony

Mandella, twenty-seven years of age at the time of her hearing in August 2009, began her testimony with general background information, including address and education. Mandella has three children, aged eight, three, and three months at the time of the hearing. (Tr. 32.) In 2003, Mandella attended vocational school for which she earned a health care provider certificate. (Tr. 31.) Afterwards, she worked as a home health care provider through Manpower, but she has not been able to look for work since 2003. (Tr. 32.) According to Mandella, she is not able to work because she has problems with absence and because of her mood swings. (Tr. 32–33.) During the average month, she has approximately twenty down days, where she may wake up with a "horrible attitude," be "really irritable," depressed, and angry, and be so tired that she can "barely get [herself] out of bed," and ten good days, where she often goes on cleaning sprees, make phone calls, and sometimes does not sleep at all. (Tr. 33–34, 36–37.)

The ALJ noted that all the jobs that Mandella has held, including customer service jobs, home health care job, office manager job, waitress work, have been shorter in duration. (Tr. 33.) Mandella testified that, because of her bipolar disorder, she has a lot of absences and that she would "just walk out of a job or [she would] get fired for things that have happened," including outbursts and absences. (Tr. 33.) For instance, when she worked at Omega Restaurant, there was a customer who was not happy about her food. According to Mandella, she took the customer's plate, threw it on the floor, and told her to get out of the restaurant, causing her termination. (Tr. 34.) When questioned by counsel, Mandella stated that she has threatened customers, sworn at customers, and told them that she wants to meet them outside and fight. (Tr. 34.) Additionally, Mandella stated that she has panic attacks for which she takes Gabapentin, and the panic attacks would often cause her to just leave the job. (Tr. 34–35.)

In 2004, Mandella began seeing Dr. Joseph Burgarino for treatment of her bipo-

lar disorder and panic attacks. (Tr. 35.) At the time of the hearing, Mandella was also seeing Dr. Kurter every month or every two weeks for the past two years. Mandella had also been seeing a psychologist, Dr. Agbuis, every month for the past two and a half or three years. (Tr. 35–36.) Mandella takes Adderall and Risperdal injections every two weeks, which cause weight gain. (Tr. 36.)

Mandella continues to struggle with anger problems. She testified that her anger is often directed at her kids, her boyfriend, her mom, and even strangers, including people driving on the road and customers at a grocery store. (Tr. 37–38.) She also testified to getting into confrontations with the crossing guard at her son's school a few times. (Tr. 38.) Additionally, Mandella has difficulties with her attention and concentration. (Tr. 39.) And, her chronic fatigue causes her lie down for about four hours in an average eight-hour day time period. (Tr. 39.) Because of her chronic fatigue, her son also misses school frequently. (Tr. 38.)

Mandella testified to receiving assistance from her boyfriend, her mother, and her boyfriend's mother. (Tr. 39–40.) While Mandella lives with her boyfriend, her mother and boyfriend's mother visit every day to every other day. (Tr. 40.) Her boyfriend does the grocery shopping, as she feels "crowded," and "nervous," and is susceptible to panic attacks while in the store. (Tr. 40.) Her boyfriend usually cooks in the evenings, except Mandella stated that she can do easy meals, including frozen pizza and sandwiches. (Tr. 41.) According to Mandella, on her down days, she cannot keep up with personal care. (Tr. 41.) Only on manic days does Mandella do housework, laundry, and shoveling. (Tr. 40–41.)

## B. Mandella's Medical Record

Mandella has received treatment from Dr. Gojko D. Stula, M.D., Dr. Carmen Agbuis, Ph.D., Dr. Joseph Burgarino, M.D., and Dr. Sela Kurter, M.D. for symptoms associated with emotional impairments and chronic fatigue syndrome ("CFS").

In September 2005, Mandella's primary care physician, Dr. Stula, opined that Mandella was unable to work due to depression. (Tr. 254–56.) In January 2006, Dr. Stula again opined that Mandella was unable to work or attend school due to depression, with such restriction expiring on June 19, 2006. (Tr. 250–52.) On May 8, 2008 and October 2, 2008, Dr. Stula examined Mandella, noting that Mandella reported being anxious, depressed, stressed, and having mood swings, decreased libido, difficulty concentrating, migraines, morning and evening fatigue, and low back pain, among other symptoms. (Tr. 421–22.) Dr. Stula's diagnosis was as follows: hormonal imbalance, hypothyroidism, CFS, insomnia, psoriasis, low back pain, scoliosis, and edema. (Tr. 421–22.) In May 2008, Dr. Stula noted that Mandella was offered Prozac by her treating psychiatrist, but she refused to take it. (Tr. 422.) Instead, she was taking St. John's wort for her depression. (Tr. 422.) In October 2008, Dr. Stula noted that Mandella was taking progesterone cream, levothyroxine, Armour Thyroid, and hydrocodone. (Tr. 421.)

In August 2009, Dr. Stula completed a "Chronic Fatigue Syndrom (CFS) Medical Assessment Form," indicating that Mandella suffered from chronic fatigue, fibromyalgia, bipolar/depression, and hypothyroidism. (Tr. 508.) Dr. Stula opined that Mandella exhibited fatigue that does not resolve with bed rest and is severe enough to reduce or impair daily activities below 50% of the pre-morbid level. (Tr. 508.) Additionally, Dr. Stula opined that Man-

della suffers from an elevated antibody titer to Epstein Barr virus. (Tr. 509.) According to Dr. Stula, Mandella had no side effects from any of the medications that may have implications for working, although she was unable to perform routine, repetitive tasks at a consistent pace, detailed, complicated, or fast paced tasks, and she could not be exposed to frequent interference with coworkers, supervisors, and the public. (Tr. 509.)

On July 24, 2006, Mandella saw a psychologist, Dr. Agbuis, at which time she reported crying on a weekly basis, feeling fatigued daily, being irritable, keyed up, and worried, and having a fear of losing control. (Tr. 345.) She also reported having poor concentration, difficulty making decisions, mood swings, and a fear of rejection. (Tr. 345.) Dr. Agbuis made a preliminary diagnosis of depression, bipolar, generalized anxiety, and panic without agoraphobia. (Tr. 346.) Dr. Agbuis also indicated that Mandella had a Global Assessment of Functioning ("GAF") score of 55. (Tr. 343.)

On May 15, 2007, Dr. Agbuis completed a Mental Impairment Medical Assessment Form regarding Mandella. (Tr. 416.) Therein, Dr. Agbuis opined that Mandella exhibited various symptoms, including weight change, decreased energy, psychomotor agitation, blunt affect, generalized anxiety, paranoia, difficulty thinking or concentrating, poor memory, sleep disturbance, personality changes, manic syndrome, panic attacks, anhedonia, obsessions/compulsions, irrational fears, irritability, lability, and isolation. (Tr. 416.) According to Dr. Agbuis, these symptoms frequently interfere with Mandella's attention and concentration needed to perform simple work tasks during the day.[1] (Tr. 416.) Side effects that may affect working include drowsiness and sedation. (Tr. 417.) Dr. Ag-

buis opined that Mandella would be absent from work about four days per month as a result of her impairments. (Tr. 417.) According to Dr. Agbuis, Mandella also suffers from, as a result of her impairments, a "marked" limitation in activities of daily living, and a "marked" to "extreme" limitation in maintaining social functioning and maintaining concentration persistence, or pace. (Tr. 418.) Finally, Dr. Agbuis opined that Mandella has "moderately severe" to "severe" difficulties understanding, remembering, and carrying out short and simple instructions or tasks and dealing with stresses of skilled or semi-skilled work, and that she has severe difficulties interacting appropriately with the general public and accepting instructions and responding appropriately to criticism from supervisors. (Tr. 419.)

On August 10, 2009, Dr. Agbuis completed another Mental Impairment Medical Assessment Form. Dr. Agbuis added Attention Deficit Hyperactivity Disorder ("ADHD") and anxiety to her diagnosis of Mandella's impairments. (Tr. 518.) This time, Dr. Agbuis opined that Mandella exhibited "marked" limitations in her activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 519.) Dr. Agbuis also noted that Mandella's impulsivity has contributed largely to her credit card debt. (Tr. 518–19.) Dr. Agbuis also opined that Mandella's ability to (1) maintain attention and concentration for a least two straight hours, (2) perform accurately and at a consistent pace, accept instructions and respond appropriately to criticism from supervisors, and (3) work in coordination with or proximity to coworkers without being distracted or distracting them was somewhere between being able to perform the designated function, but

---

**1.** Frequently is defined as 34% to 66% of an eight-hour working day. (Tr. 416.)

with noticeable difficulty about 20% of the work day, and not being able to perform the function on a regular, reliable, and sustained schedule basis. (Tr. 520.) However, Dr. Agbuis did note that Mandella was able to interact appropriately with the general public. (Tr. 520.)

On September 6, 2006, Mandella began seeing a psychiatrist, Dr. Burgarino, on a monthly basis. (Tr. 411.) On May 8, 2007, Dr. Burgarino completed the same Mental Impairment Medical Assessment Form that Dr. Agbuis completed. Dr. Burgarino reported many of the same findings regarding Mandella's impairments, abilities, and restrictions. (Tr. 411–14.) According to Dr. Burgarino, Mandella's current GAF, at that time, was 53. (Tr. 411.) Dr. Burgarino reported that the side effects of Mandella's medications that may implicate her ability to work were drowsiness and sedation. (Tr. 412.) According to Dr. Burgarino, Mandella would be absent from work approximately four days per month because of her impairments. (Tr. 412.) In addition, Dr. Burgarino opined that Mandella had "marked" limitations in activities of daily living and maintaining both social functioning and concentration, persistence, or pace. (Tr. 413.) Finally, Dr. Burgarino opined that Mandella had "severe" limitations (1) understanding, remembering, and carrying out detailed instructions; (2) completing a normal workday/week without interruptions from symptoms and performing even routine repetitive work at a consistent pace without an unreasonable number and length of rest periods; (3) interacting appropriately with the general public; and (4) accepting instructions and responding appropriately to criticism from supervisors. (Tr. 414.)

In December 2006, Dr. Kenneth Sherry, Ph.D. evaluated Mandella and opined as follows:

This individual has the ability to understand, remember and carry out instructions of a moderate complexity. I think that her abilities, attention and concentration are adequate for that level of task. [Mandella] should be able to maintain pace on tasks that are simple without difficulty. Responding to supervisors and coworkers would be within the grasp of this individual if she was so motivated. Working with the general public would probabl[y] be difficult for her. I would think that the regimen of routine and responsibility would be quite beneficial in establishing structure in the life of Ms. Mandella.

(Tr. 377.)

On October 31, 2007, Mandella began seeing another psychiatrist, Dr. Kurter. (Tr. 442.) On February 25, 2009, Dr. Kurter completed a Mental Impairment Medical Assessment Form regarding Mandella. (Tr. 442–44.) For Mandella's prognosis, he noted it was "[g]uarded–[l]imited." (Tr. 442.) He indicated, by checking certain boxes, that Mandella suffered from symptoms that were substantially similar to those identified by Dr. Agbuis. (Tr. 442.) According to Dr. Kurter, the side effects of Mandella's medications include drowsiness and sedation. (Tr. 442.) In addition to Mandella's "marked" to "extreme" limitations in maintaining social functioning and concentration, persistence, or pace, Dr. Kurter noted that Mandella has noticeable difficulty about 20% of the work day with (1) understanding, remembering, and carrying out one or two step instructions; (2) maintaining attention and concentration for at least two straight hours; (3) sustaining an ordinary routine without special supervision; (4) completing a normal workday/week without interruptions from symptoms that cause an unreasonable number (more than three/day) and length of rest periods; (5) accepting instructions and responding appropriately to

criticism from supervisors; (6) working in coordination with or proximity to coworkers without distractions; and (7) dealing with stresses of skilled/semiskilled work. (Tr. 444.) Moreover, Dr. Kurter opined that Mandella was unable to understand, remember, and carry out detailed instructions, and was unable to perform accurately and at a consistent pace. (Tr. 444.) However, Dr. Kurter opined that Mandella was able to interact appropriately with the general public. (Tr. 444.)

Over the years, Mandella has been prescribed the following psychotropic medications: Lexapro, Lorazepam, Neurontin, Zoloft, Clonazepam, Paxil, Geodon, Lamictal, Prozac, Ambien, Sertraline, Klonopin, Citalopram, Effexor, Adderall, and Risperdal injections. (Tr. 36, 139, 159, 192.) Mandella has repeatedly complained of fatigue, low energy, irritability, and worry.

## C. Vocational Expert's Testimony

Allen R. Searles ("Searles") testified at the hearing as a vocational expert ("VE"). ALJ Bernoski presented a hypothetical person to Searles for his opinion on whether any positions exist for this person. The ALJ described the hypothetical individual as "a younger female person with the claimant's vocational background.... Her primary impairments are the bipolar and the chronic fatigue syndrome...." (Tr. 42.) In terms of Mandella's restrictions, the ALJ assumed those restrictions that Dr. Sherry opined in his report. (Tr. 42.) That is, the ALJ stated that "for restrictions I want you to accept ... that this individual has the ability to understand, remember and carry out instructions of a moderate complexity. [T]he patient should be able to maintain pace on tasks that are simple without difficulty. Responding to supervisors and coworkers to be within the grasp of this individual if she is so motivated.... Working with the general public would probably be difficult to her." (Tr. 42–43.) Searles found that

with these restrictions, the hypothetical individual would have the capacity to perform the functions of a street cleaner (11,-210 jobs), a bagger (of laundry garments) (3,770 jobs), and an assembler (industrial factory work) (10,250 jobs). (Tr. 23, 43–44.) These jobs are all unskilled, simple, entry level type work. (Tr. 43–44.)

Mandella's attorney, David Dreis ("Dreis"), then asked the VE a few questions. First, he asked whether jobs existed for a hypothetical person with "frequent interference with ... attention, concentration performing simple work tasks," and with difficulty in an "ability to remember, understand and carry out simple, one, two-step instructions" for about 80% of the workday. (Tr. 44–45.) The VE indicated that such restrictions would eliminate work in the competitive labor market. (Tr. 45.) Next, Dreis asked whether jobs existed for a hypothetical person who would be absent from work at least four days a month because of her bipolar disorder. (Tr. 45.) In Searles's opinion, missing this much work would preclude employment in the occupations previously listed as available for the hypothetical individual. (Tr. 45.) If this hypothetical person exhibited an increased need to rest, Searles testified that employment in the occupations previously listed as available would also be precluded. (Tr. 45.) The next hypothetical asked about whether jobs existed for a hypothetical person with a severe impairment in dealing with coworkers, working in coordination with or proximity to coworkers and supervisors, and being able to accept instructions and respond appropriately to criticism from supervisors. (Tr. 45–46.) The VE indicated that such a hypothetical would also eliminate all work in the competitive labor market. (Tr. 46.) Finally, the VE indicated that physical and verbal outbursts against customers, coworkers, and supervisors of the nature Mandella testified about

"wouldn't be tolerated" in an unskilled job. (Tr. 46.)

## D. ALJ's Decision

The ALJ must follow a required five-step sequential evaluation to determine a claimant's disability status. 20 C.F.R. § 416.920. At the first step, the ALJ must determine if the claimant is engaged in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). If so, the claimant is not disabled. *Id.* Here, Mandella had not engaged in substantial gainful activity since her alleged amended onset date of July 20, 2006, so the ALJ moved forward to step two. (Tr. 17.)

Under step two, the ALJ determines whether an impairment is "severe," which means that the impairment significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 416.920(a)(4)(ii); *see also* 20 C.F.R. § 416.921. Here, the ALJ determined that Mandella's impairments include "depressive disorder (bipolar disorder)," and chronic fatigue disorder. (Tr. 17.) The ALJ therefore continued his analysis to step three.

In evaluating a claimant's severe impairments under step three, an ALJ must determine if the severe impairments listed in step two meet or equal the requirements of any listed section or any part of the List of Impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"). 20 C.F.R. § 416.920(a)(4)(iii). Here, The ALJ found that Mandella's impairments do not meet or equal the impairments found in the Listings. (Tr. 18.) Mandella did not qualify as "disabled" under step three, so the ALJ proceeded to step four. (Tr. 20–22.)

At step four, the ALJ must determine whether the claimant has the capacity to return to her previous work. 20 C.F.R. § 416.920(a)(4)(iv). Here, the ALJ determined that Mandella has no past relevant work in substantial gainful employment because Mandella was last employed in 2003, and that, "since July 26, 2006," she "has not engaged in substantial gainful activity." (Tr. 22.) Accordingly, "[t]ransferrability of job skills is not an issue . . . ." (Tr. 22.) Based upon such finding, the ALJ continued to step five. (Tr. 23.)

At step five, the final step, the ALJ must evaluate the claimant's capability of doing other work. Here, the ALJ found that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Mandella] can perform." (Tr. 23.)

The ALJ found that Mandella "has not been under a disability, as defined in the Social Security Act, at any time prior to July 20, 2006, the amended onset date for this claim (20 CFR 404.350(a)(5) and 404.1520(g) and 416.920(g)[) ]." (Tr. 23.) He therefore denied Mandella's application for SSI payments. (Tr. 23.)

## IV. STANDARD OF REVIEW

 Judicial review of a social security determination is limited to determining whether the ALJ's decision is supported by "substantial evidence." *See* 42 U.S.C. § 405(g); *Scheck v. Barnhart,* 357 F.3d 697, 699 (7th Cir.2004). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citing *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). When reviewing the substantial evidence, the court may "not displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart,* 347 F.3d 209, 212 (7th Cir.2003)). However, the

ALJ's decision must be sufficient to assure the court that she built an accurate and logical bridge between the evidence and the result so that a reviewing court may afford the claimant review of the SSA's "ultimate findings," *see Blakes v. Barnhart,* 331 F.3d 565, 569 (7th Cir.2003) (citing *Scott v. Barnhart,* 297 F.3d 589, 595 (7th Cir.2002); *Steele v. Barnhart,* 290 F.3d 936, 941 (7th Cir.2002)); *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996). If the ALJ rejects uncontradicted evidence, reasoning for that rejection must be clearly articulated. *See Walker v. Bowen,* 834 F.2d 635, 643 (7th Cir.1987), superseded by statute, 20 C.F.R. §§ 404.1529, 416.929, *as recognized in Pope v. Shalala,* 998 F.2d 473 (7th Cir.1993). Where conflicting evidence allows reasonable minds to differ in determining whether the claimant is entitled to benefits, the responsibility for that decision rests with the Commissioner. *Schoenfeld v. Apfel,* 237 F.3d 788, 793 (7th Cir.2001).

Reversal is warranted only if the Commissioner's findings lack support by substantial evidence. *Rohan v. Chater,* 98 F.3d 966, 970 (7th Cir.1996). Additionally, if the ALJ commits an error of law, reversal is required unless the error is harmless. *Keys v. Barnhart,* 347 F.3d 990, 994–95 (7th Cir.2003). An ALJ commits an error of law if his decision fails to comply with the Commissioner's regulations and rulings. *Brown v. Barnhart,* 298 F.Supp.2d 773, 779 (E.D.Wis.2004). The court's review is confined to the rationale provided in the ALJ's decision. *Steele v. Barnhart,* 290 F.3d 936, 941 (7th Cir.2002) (citing *SEC v. Chenery Corp.,* 318 U.S. 80, 93–95, 63 S.Ct. 454, 87 L.Ed. 626 (1943)).

## V. DISCUSSION

To qualify for SSI, the claimant must be "disabled." The Social Security Act defines "disabled" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The disability must be sufficiently severe that the claimant cannot return to his prior job and is not capable of engaging in any other substantial gainful work that exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

As previously discussed, in determining whether Mandella was engaged in substantial gainful activity, the ALJ applied the following five step inquiry: (1) whether Mandella is currently unemployed; (2) whether Mandella has a severe impairment; (3) whether Mandella's impairments equates to one of the impairments listed in the Listings; (4) whether Mandella is unable to perform past relevant work; and (5) whether Mandella is incapable of performing work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4); *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir.2001). An affirmative answer leads to the next step, or an affirmative answer on steps 3 and 5 leads to a finding that the claimant is disabled. A negative answer at any point, other than on step 3, ends the inquiry and leads to a determination that a claimant is not disabled. *Zurawski v. Halter,* 245 F.3d 881, 885–86 (7th Cir.2001) (citing *Zalewski v. Heckler,* 760 F.2d 160, 162 n. 2 (7th Cir. 1985)). Before proceeding to step 4, the ALJ must assess the claimant's residual functioning capacity ("RFC"), which is defined as the "most [a claimant] can still do despite [their] limitations." *See* 20 C.F.R. §§ 404.1520(a)(4), 404.1545(a)(1). An ALJ determines a claimant's RFC by considering the claimant's capacity, age, education, work experience, and any limitations caused by impairments. 20 C.F.R. § 416.920(a)(4)(v).

Mandella challenges the ALJ's decision in the following three respects: (1) the

ALJ failed to properly evaluate the treating sources' opinions; (2) the ALJ inaccurately determined Mandella's RFC; and (3) the ALJ failed to properly evaluate the credibility of her testimony. I will analyze the various challenges in turn.

## A. Treating Source Opinions

■■■■ Generally, the ALJ gives more weight to opinions from a claimant's treating physician because the physician has a greater familiarity with the claimant's conditions and circumstances over a period of time. 20 C.F.R. § 404.1527(d)(2). An ALJ must afford a treating physician's medical opinion "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence . . . ." 20 C.F.R. § 404.1527(d)(2); *see also* Social Security Ruling ("SSR") 96–2p, 1996 SSR LEXIS 9 ("SSR 96–2p") (setting forth the weight that an ALJ is to give to treating sources' statements). "Not inconsistent" means that a "well-supported treating source medical opinion need not be supported directly by all of the other evidence . . . as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion." SSR 96–2p. Inconsistencies in a treating physician's opinion, whether the opinion is inconsistent with other substantial evidence in the record or is internally inconsistent, may justify denying the opinion controlling weight. *See* 20 C.F.R. § 404.1527(c)(2); *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir.2000).

■■■■ If an ALJ finds that a treating source opinion is not entitled to controlling weight, she may not simply reject it. *See* 20 C.F.R. § 404.1527(d). While the physician's opinion no longer is controlling, it becomes "just one more piece of evidence for the [ALJ] to weigh." *See Hofslien v. Barnhart*, 439 F.3d 375, ·376–77 (7th Cir. 2006). Accordingly, she must evaluate the opinion's weight by considering the length, nature, and extent of the claimant's treatment relationships with her physicians, the degree to which the opinion is supported by evidence, the opinion's consistency with the record as a whole, whether the doctor is a specialist, and "other factors." § 404.1527(d). The ALJ must give "good reasons" to support the weight she ultimately assigns to the treating physician's opinion. 20 C.F.R. § 404.1527(d)(2).

Mandella argues that the ALJ failed to properly evaluate the treating source opinions of Drs. Burgarino, Agbuis, Kurter, and Stula. Specifically, Mandella contends that the ALJ ignored the "regulatory factors," those being the examining relationship, the length and frequency of treatment, specialization of the doctor, and so forth. Mandella further argues that the ALJ's "assessment of the treating source opinions is replete with odd notions of the nature of a bipolar disorder." (Pl.'s Br. 12.)

Although the ALJ did not ignore the medical source statements of Drs. Burgarino, Agbuis, and Kurter, he did indicate that he did "not give[ ] them controlling weight in determining [Mandella's] mental residual functional capacity." (Tr. 21.) Generally, the ALJ indicated that the "entries in the checklist forms simply do not have foundation in the medical signs and symptoms noted in their treatment records. The two analyses just cannot be reconciled." (Tr. 21.) Below is an analysis of the ALJ's rejection of each of the opinions of Mandella's treating physicians, and for the following reasons, I find that the ALJ did not give "good reasons" to support his decision to discount the treating source opinions.[2]

2. Here, there was evidence—the report and opinion of the consultant—that contradicted the opinions of the treating physicians. How-

### 1. Dr. Burgarino

The ALJ noted that Mandella saw Dr. Burgarino five times between September 8, 2006 and May 8, 2007. However, the ALJ did not give his opinion controlling weight because (1) Dr. Burgarino noted that Mandella's depressive and anxiety related symptoms were responding to medication; (2) there was no evidence of long-term memory deficit; (3) Dr. Burgarino's treatment notes do not suggest any limitations in Mandella's ability to respond to supervisors and coworkers, if she was so motivated, or in her ability to work with the general public; and (4) Mandella was caring for her two children and attending medical appointments as needed. (Tr. 18–21.) According to the ALJ, "[t]his is true in respect to claimant's behavior during the time period, her GAF score (from 60–68) and with respect [to] the credibility of the information that claimant conveyed...." (Tr. 21.)[3] After reviewing the record, I find that these reasons do not support the ALJ's decision to refuse to give Dr. Burgarino's opinion controlling weight.

On September 6, 2006, Mandella presented herself to Aurora Behavioral Health Services for an initial assessment. On September 8, 2006, Mandella saw Adult Nurse Practitioner ("ANP") Margaret M. Frittittla, who assigned a GAF of 50. (Tr. 365.) At the time, Mandella reported being impulsive, easily upset, and worried about everything. (Tr. 365.) ANP Frit-

tittla prescribed Mandella Lorazepam and Laical. (Tr. 366.) On October 10, 2006, Mandella saw Dr. Burgarino, who assigned a GAF of 60. (Tr. 363.)[4] In November 2006, ANP Frittittla noted that there was no change in Mandella's level of functioning, assigning her a GAF of 60. (Tr. 362.)

Mandella saw Dr. Burgarino again on March 16, 2007. (Tr. 450.) From the little this court can decipher of his treatment notes, Mandella reported severe mood swings at the time. He prescribed Klonopin and Lamictal, and remained constant in his GAF score of 60. (Tr. 450–51.) On May 8, 2007, Dr. Burgarino reported moderate improvement in Mandella's level of functioning, assigning a GAF score of 68. (Tr. 448.)

To the extent that the ALJ believed Dr. Burgarino's treatment records are in conflict with his medical assessment of her limitations, a review of the these treatment records leads me to find otherwise. First, the ALJ's reference to Mandella's apparent positive response to medication does not take into account her failure to often times take her medication. Thus, the ALJ's conclusion ignores "one of the most serious problems in the treatment of mental illness—the difficulty of keeping patients on their medications." *Spiva v. Astrue,* 628 F.3d 346, 351 (7th Cir.2010.) Dr. Burgarino (as well as her other treating doctors) recognizes that the medications she takes for her symptoms

---

ever, the ALJ's decision to refuse to give controlling weight to the opinions of Mandella's treating physicians does not appear to be based on the consultant's report. Because the court's review is confined to the rationale provided in the ALJ's decision, my review will be confined to whether the ALJ's decision to deny controlling weight to Mandella's treating sources' opinions because they were inconsistent with the treatment records was supported with "good reasons."

**3.** The ALJ fails to mention that Mandella's GAF score also fell below 60 several times. (GAF of 50, Tr. 365; GAF of 50, Tr. 367, 371; GAF of 45, Tr. 480; GAF of 55, Tr. 343; GAF of 53, Tr. 411.)

**4.** A GAF score of 60 means that Mandella was either exhibiting moderate symptoms of mental illness or experiencing moderate difficulty in social, occupational, or school functioning. *Punzio v. Astrue,* 630 F.3d 704, 711 (7th Cir. 2011) (citing Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000)).

often cause drowsiness and/or sedation. (Tr. 412.) Thus, even if the injections she is receiving result in better compliance with treatment, the ALJ failed to discuss how the side effects of the medications affect her ability to work.

■ The ALJ's second reason for discounting Dr. Burgarino's opinion—there was no evidence of long-term memory deficit—also fails to explain how the absence of long-term memory deficit means that Mandella has the ability to work full-time. Even if Mandella's long-term memory is intact, she may still not have the ability to get to work, get to work on time, and be able to concentrate and be attentive for a eight-hour work day. After all, even if Mandella's long-term memory is intact, the vocational expert testified that Mandella would be precluded from working if she experiences four or more "bad days" (that may very well be unrelated to her long-term memory capacity) per month that cause her to miss work. Mandella's projected monthly absence from work, a number that was consistent with each of her treating doctors' opinions, was never considered by the ALJ. Simply stated, the ALJ did not build an accurate and logical bridge from his finding that Mandella suffered no long-term memory deficit, to his conclusion that Dr. Burgarino's assessment of Mandella's limitations was too extreme.

■ Third, the ALJ's finding that Dr. Burgarino's *treatment notes* "do not suggest any limitation" in "responding to supervisors and coworkers . . . if she was so motivated" and working with the general public is not a good reason for discounting Dr. Burgarino's *opinion* that she suffered from such limitation.[5] To be sure, the

ALJ is correct in noting that Dr. Burgarino's *treatment notes* do not reflect the conclusion that she cannot or has difficulty responding to coworkers and supervisors. However, merely because the treatment records do not specifically state that Mandella was unable to or has difficulty with such tasks does not mean that the reverse is true, which is to say that it is not evidence that she has the ability to perform such activity. Mandella has been unemployed since 2003. The notes from Aurora Behavioral Health Centers reflect that Mandella has issues with anger management, and that she cannot hold down a job because she either quit or got fired. She testified that she does not even grocery shop much because she feels "crowded," and "nervous," and is susceptible to panic attacks while in the store. Because Mandella has been unemployed and because she limits her interactions with the general public, naturally, her treatment records do not speak directly to her ability to perform such activities. But, that is not to say that she does not suffer from a "severe" limitation with such activities.

Moreover, using the absence of an express limitation contained within Mandella's treatment notes runs contrary to the focused inquiry that the regulations endorse, as 20 C.F.R. § 404.1513(b)(6) requests from claimants "a medical source statement about what you can still do despite [their] impairment(s)." *See also* 20 C.F.R. § 404.1545(a)(3) ("We will consider any statements about what you can still do that have been provided by medical sources. . . ."; "We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symp-

---

5. It is unclear whether the ALJ believed that the treatment notes of Dr. Kurter, Dr. Agbuis, and Dr. Burgarino did not suggest any limitation in responding to supervisors and coworkers if Mandella was motivated, or in working with the general public, or both. However, in context, it appears that the ALJ suggested no limitation in both areas, and the court will proceed to analyze *his* decision accordingly.

toms, such as pain, provided by you, your family, neighbors, friends, or other persons."). As noted by the Seventh Circuit in *Punzio*, the claimant bears the burden of submitting medical evidence establishing her impairments and her RFC. 630 F.3d at 712. "How else can she carry this burden other than by asking her doctor to weigh in? Yet rather than forcing the ALJ to wade through a morass of medical records, why not ask the doctor to lay out in plain language exactly what it is that the claimant's condition prevents her from doing?" *Id.* Being that Dr. Burgarino opined that Mandella is a severely limited in her ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism, and that she has a "moderately severe" limitation in her ability to work in coordination or proximity with coworkers, the ALJ's refusal to consider this opinion reflects yet again why his rejection of Dr. Burgarino's opinion is not supported by substantial evidence.

 Finally, in support of his finding that Mandella is not functionally limited in her activities of daily living, the ALJ stated that she takes care of her two children and attends medical appointments as needed. (Tr. 21.) First, the ALJ ignores the evidence in the record suggesting that Mandella's boyfriend, mother, and mother-in-law assist her in these task on a daily basis. More importantly, the activities to which the ALJ cites do not automatically mean that Mandella is capable of working full time. "Because a person can take care of personal needs and care for her children in a home environment does not demon-

strate, without more, that she can function in a workplace setting on a sustained basis." *Williams v. Astrue*, No. 1:08–cv–1353, 2010 WL 2673867, at *2, 2010 U.S. Dist. LEXIS 65151, at *39 (S.Dist.Ind. June 29, 2010); *see also Punzio v. Astrue*, 630 F.3d at 712 (stating that a claimant's "ability to struggle through the activities of daily living does not mean that she can manage the requirements of a modern work-place"). Dr. Burgarino reported that Mandella has a "marked" limitation in her activities of daily living, and the ALJ failed to point out why this finding was inconsistent with his treatment notes or how it translated into an ability to work an eight-hour day.[6]

### 2. Dr. Agbuis

In discounting Dr. Agbuis's opinion, the ALJ stated that, despite Dr. Agbuis's assessment of "significant mental limitations" in the Mental Impairment Medical Assessment Form," "there are minimal mental status findings contained in Dr. Agbuis's reports or elsewhere in the record." (Tr. 20.) Furthermore, the ALJ noted that Dr. Agbuis did not "cite objective findings and her conclusions appear to be based upon the claimant's subjective complaints," which he labeled as "unreliable foundation" and found "not totally credible." (Tr. 20–22.)[7] Observing that there were no follow-up notes from Dr. Agbuis that would "allow for an assessment of progression of symptoms," the ALJ discounted Dr. Agbuis's assessment questionnaire.

Problematic to the ALJ's rejection of Dr. Agbuis's opinion because it was based

---

6. Moreover, the ALJ's discussion about Mandella's functional limitation in her activities of daily living was inconsistent. The ALJ found both that Mandella "is capable of all her activities of daily living," and that she "has mild difficulties in function of activities of daily living." (Tr. 19.)

7. The ALJ stated that he "considered claimant's allegations with regard to her depressive symptoms, but [found] that it is unlikely she experienced the symptoms she claimed to the degree alleged in the questionnaire from Dr. Agbuis...." (Tr. 20.)

on Mandella's subjective complaints is that he did not adequately explain why he did not find Mandella's subjective complaints credible. The ALJ found that Mandella's statements regarding her limitations were "credible only to the extent they indicate an inability to engage in activity exceeding the residual functional capacity as found above." (Tr. 22.) Moreover, the ALJ found that her credibility was further diminished by "her activities," and by the treatment notes indicating that she "was responding well to medication." (Tr. 22.)

At the outset, the ALJ appears to have arrived at his RFC determination even before assessing Mandella's credibility. Because "RFC determinations are inherently intertwined with matters of credibility," *Outlaw v. Astrue*, 412 Fed.Appx. 894, 897 (7th Cir.2011), the ALJ should have assessed Mandella's credibility and accounted for such finding in his RFC determination.

There is a more substantial error in the ALJ's analysis, however. As previously discussed, taking care of her children and attending medical appointments does not automatically translate into an ability to work an eight-hour day. Such activities are not necessarily inconsistent with Mandella's subjective complaints stemming from various mental impairments. Because the ALJ does not logically connect his finding with respect to Mandella's daily activities to an ability to engage in gainful employment, such finding should not have served as the basis for an adverse credibility determination.

Also previously discussed was the ALJ's erroneous reliance on Mandella's response to treatment. It bears repeating that a serious problem in the treatment of mental illness is the difficulty of keeping patients on their medications. This very difficulty is reflected in Dr. Agbuis's report that Mandella's memory was bad, and therefore, she was receiving medication by injections twice a month so that she could get to the clinic and remain compliant with medication. (Tr. 518–19.) And, even if Mandella remains compliant with her medications, no consideration was given to the side effects of her medication, as required by SSR 96–7p, 1996 SSR LEXIS 4, and 20 C.F.R. § 404.1529(c)(3). Moreover, "there can be a great distance between a patient who responds to treatment and one who is able to enter the workforce." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir.2011). The ALJ did not factor this difference into his analysis before discounting Mandella's credibility, even though she has repeatedly reported experiencing depression, irritability, fatigue, mood swings, and worry throughout her treatment history.

One final note with respect to Dr. Agbuis's opinion. The ALJ stated that Dr. Agbuis (and Dr. Kurter) "noted that [Mandella's] intellectual functioning was average, thought processes were logical, goal oriented, her memory was normal, and that she had fair judgment and insight and good impulse control, with no evidence claimant suffered from significant psychomotor retardation, significant disturbance of or changes in pattern of sleep, appetite, or activities in daily living." (Tr. 21.) Even if Mandella's intellectual functioning was average, her thought process was logical, and her memory was normal, Mandella's functionally limiting impairments, in whatever degree they exist, have not been accounted for. An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir.2009). Moreover, although Dr. Agbuis's treatment notes do not reflect that Mandella suffered from "psychomotor retardation, significant disturbance of or changes in patterns of sleep, appetite, or activities in daily living,"

her treatment notes are not inconsistent with the assessment form she completed in May 2007 or in August 2009, wherein she opined that Mandella's impairments caused "appetite disturbance/weight change," "psychomotor agitation or retardation," "sleep disturbance," and "marked" limitations in activities of daily living. (Tr. 482–85, 518–20.) As previously discussed, the absence of identification of these precise symptoms in her treatments notes does not mean that the notes cannot be reconciled with her assessment of Mandella's condition. *See Punzio,* 630 F.3d at 712.

 Because the ALJ's adverse credibility determination was not supported by substantial evidence, the reasons the ALJ gave for discounting Dr. Agbuis's assessment were not "good reasons." And, even if there the ALJ met this standard, he still ignored an important factor that requires consideration: "consistency and supportability of the physician's opinion." *Scott,* 647 F.3d at 740. Dr. Agbuis's opinion was not an aberration from the opinions of Mandella's other treating doctors. In fact, Dr. Agbuis's treatment notes and opinion are rather consistent with the treatment notes and opinions of Dr. Burgarino and Dr. Kurter—both in her assessment and in Mandella's reported symptoms. Given that "a person who suffers from a mental illness will have better days and worse days, and thus "a snapshot of any single moment says little about her overall condition," *Punzio,* 630 F.3d at 710, the ALJ should have examined the totality of Mandella's treatment records.

### 3. Dr. Kurter

The ALJ indicated that Dr. Kurter's checklist form regarding Mandella's work-related activities and ability is inconsistent with his treatment records. (Tr. 21.) ("His minimal mental status findings noted at the time of the written progress notes

are not consistent with the extreme limitations assessed by Dr. Kurter....") Notably, the ALJ pointed out that Dr. Kurter reported that Mandella's thought processes were logical, sequential, and goal oriented. (Tr. 21.) Additionally, the ALJ stated that his "objective assessment remained consistent with very few abnormal findings and he persistently noted that claimant remained 'very functional-successful' and within normal limits. Dr. Kurter further made notations in his treatment notes regarding claimant's ability to care for her two children as well as her third pregnancy." (Tr. 21.)

To reiterate, the ALJ, in responding to both Dr. Kurter's and Dr. Agbuis's opinions, stated as follows:

> There was little indication that claimant's mental impairments, even though severe, rendered her unable to engage in substantial gainful activities, as Dr. Agbuis and Dr. Kurter noted that her intellectual functioning was average, thought processes were logical, goal oriented, her memory was normal, and that she had fair judgment and insight and good impulse control, with no evidence claimant suffered from significant psychomotor retardation, significant disturbance of or changes in patterns of sleep, appetite, or activities in daily living.

(Tr. 21.) Accordingly, the ALJ stated that it "would seem that someone with cognition intact would not function at the 'poor or none' level in the many areas Dr. Kurter and Dr. Agbuis indicated." (Tr. 21.)

 Contrary to the ALJ's opinion, I do not agree that Dr. Kurter's treatment notes are inconsistent with his assessment of Mandella's limitations. On October 31, 2007, Dr. Kurter noted that Mandella's chief complaints were that she was not consistent with things, she was having "mood problems," where she would have "periods of depression" and "periods of

feeling good," and she was having panic attacks (Tr. 468.) She reported fearing "groups of people," spending $167,000 in less than a year, increased appetite, low self-esteem, and anxiety. (Tr. 468.) Dr. Kurter also noted that some of the medications she was on made her sleep too much, made her feel disconnected, or did not improve her symptoms. (Tr. 469.) At this time, her mood was "[d]own," but her thought process was logical and goal-oriented. (Tr. 470.) On November 28, 2007, Mandella told Dr. Kurter that she often forgot to take her medications and that she was still experiencing stress and anxiety. Her mood was "[d]own" again that day, although her thought process was once again logical. (Tr. 467.)

On March 5, 2008, Mandella reported to Dr. Kurter that she was "not doing well," that she was anxious and irritable, and that she could not remember to take her medications. (Tr. 466.) She was having recurrent panic attacks, mood swings, but her thought process was logical again. (Tr. 466.) Mandella reported that she was still feeling depressed and anxious on June 2, 2008, when she saw Dr. Kurter next. (Tr. 465.) She was not taking Clonazepam any longer "due to sedation." (Tr. 465.) Once again, her mood was "[d]own" and reported that she "[n]ever fe[lt] like [her] mood [was] improving." (Tr. 465.) On June 25, 2008, Mandella's mood was "better a little," but she had some anxiety. (Tr. 464.) She reported discontinuing the Prozac because it made her feel more depressed, but stated that she may continue taking the St. John's Wort, but Dr. Kurter discussed the potential side effect of mania with this medication. (Tr. 464.)

By August 27, 2008, Mandella reported to always feeling on edge. (Tr. 463.) She had also discontinued some medication because of adverse side effects. (Tr. 463.) By Mandella's October 22, 2008 session with Dr. Kurter, she was three months pregnant at the time. She reported experiencing depression still, and Dr. Kurter prescribed Zoloft and advised her to continue taking her other medications. (Tr. 462.) On November 26, 2008, Mandella was still "[f]eeling down most of the day," and she was sleeping too much, easily frustrated, and lacked energy. However, she reported not having any side effects to Zoloft. (Tr. 461.)

The final treatment notes from Dr. Kurter are dated January 28, 2009 and either February or March 25, 2009. In January, Mandella was feeling depressed and was prescribed Sertraline. (Tr. 460.) By her next visit, she reported that her mood was "up/down" and that she stopped taking Sertraline but that she was still taking Gabapentin. (Tr. 459.)

Contrary to the ALJ's finding, Dr. Kurter's treatment notes are consistent with his identification of the following symptoms or signs exhibited by Mandella due to her impairments: "appetite disturbance/weight change," "illogical thinking/loosening of association," "decreased energy/chronic fatigue," "psychomotor agitation or retardation," "generalized persistent anxiety-severe," "difficulty thinking or concentrating," "poor memory," "sleep disturbance," "personality changes," "manic syndrome," "recurrent panic attacks," "anhedonia," "obsessions/compulsions," "hostility/irritability," "mood disturbances/lability," "social withdrawal/isolation." (Tr. 442.) Once again, because Dr. Kurter's treatment notes do not specifically state what activities and tasks Mandella could and could not perform does not mean that the treatment notes are inconsistent with the medical assessment. *See Punzio*, 630 F.3d at 712. Moreover, the ALJ inexplicably states that "someone with cognition intact would not function at the 'poor or none' level in the many areas Dr. Kurter . . . indicated."

(Tr. 21.) "Cognition intact" does not necessarily mean that someone can function at a proper level, particularly someone with other mental impairments (which the ALJ ignored and/or dismissed). By focusing on Mandella's cognition, and both ignoring and/or dismissing other functionally limiting mental impairments, the ALJ appears to have substituted his own medical judgment for that of Dr. Kurter's. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.1996).

■ Finally, it appears that it was another psychiatrist practicing at Lutheran Social Services, Dr. Wess Vogt, M.D., that described Mandella as "[v]ery functional—successful." (Tr. 479.) Mistakenly, the ALJ attributed this opinion to that of Dr. Kurter. Despite the court's best efforts, the rest of Dr. Vogt's notes cannot be discerned. However, it does appear that Dr. Vogt met with Mandella on only one occasion—September 17, 2007. (Tr. 473–80.) Thus, it was error for the ALJ to rely on the notes from a doctor who saw Mandella only one time and then to attribute that assessment to Dr. Kurter.[8]

### 4. Dr. Stula

Mandella contends that the ALJ did not properly evaluate her CFS. It is Dr. Stula that diagnosed her with CFS, as well as with fibromyalgia. Therefore, the ALJ's analysis of Dr. Stula's opinion concerns those two diagnoses. Although it is clear that the ALJ did not give Dr. Stula's opinion controlling weight, it is not clear what value his assessment did merit in the ALJ's opinion. The ALJ indicated that his review of Dr. Stula's notes "covering September 2005 through May 8, 2008 fail to record observations that claimant looked tired or that her mood was depressed." (Tr. 17.) The ALJ also stated that Dr. Stula, in the medical source questionnaire, "imposed extreme limitations in claimant's ability to stand, walk, lift and carry." (Tr. 18.) Despite these extreme limitations, the ALJ found that there was insufficient objective medical evidence to support Mandella's complaints of continuing pain. (Tr. 18–19.) He stated as follows:

> [T]he medical statement and findings regarding claimant's residual functioning capacity are not accompanied by a report of a physical examination he performed on claimant, his medical source questionnaire does not cite to any clinical findings supportive of his conclusions, *and* further, Dr. Stula did not otherwise provide supportive subsequent evidence referencing clinical findings or otherwise explain its basis, covering the period from September 2005 through August 2009.

(Tr. 19.) It is the ALJ's evaluation of Mandella's CFS that Mandella appears to claim is inadequate.

SSR 99–2p, 1999 SSR LEXIS 3, explains that CFS, "when accompanied by appropriate medical signs or laboratory findings, is a medically determinable impairment that can be the basis for a finding of 'disability.' " Evidence used to confirm a diagnosis of CFS includes self reported impairment in short-term memory or concentration, muscle and joint pain, and unrefreshing sleep. Medical signs or laboratory findings, including an elevated

---

8. Mandella also challenges the ALJ's statement that neither Dr. Kurter's notes nor Dr. Agbuis's notes suggest any limitation in responding appropriately to supervisors and coworkers. Just as with Dr. Burgarino's opinion, the ALJ was too quick in finding inconsistency with Dr. Kurter's and Dr. Agbuis's opinions, thereby resulting in a failure to account for their opinions that Mandella had noticeable or severe difficulties dealing with supervisors and coworkers. Merely because Dr. Kurter's and Dr. Agbuis's treatment notes do not suggest such limitation does not put their treatment notes in conflict with their assessment that Mandella possesses such limitations.

antibody titer to Epstein–Barr virus ("EBV"), can also establish the existence of a medically determinable impairment in individuals with CFS. *See* SSR 99–2p.

■ The reasons the ALJ gave for discounting Dr. Stula's opinions fail to meet the required standard for two reasons. First, Dr. Stula's notes reflect a diagnosis of CFS/fatigue and depression and/or bipolar on many occasions. Dr. Stula noted a diagnosis of fatigue on August 22, 2006, October 20, 2006, November 27, 2006, June 4, 2007, September 11, 2007, December 18, 2007, and February 5, 2008. (Tr. 434, 433, 432, 427, 426, 425, 424.) Dr. Stula also confirmed depression and/or bipolar as a diagnosis on August 22, 2006, October 20, 2006, November 27, 2006, June 4, 2007, and September 11, 2007. (Tr. 434, 433, 432, 427, 426.) To be sure, Dr. Stula wrote "see symptoms" under the "history of present illness" space in many of his treatment notes, and therefore, notes indicating that Mandella "looked tired" or that "her mood was depressed" do not exist on these individual treatment notes. However, not only are such symptoms connected to Dr. Stula's diagnosis of CFS/fatigue and depression/bipolar, but Dr. Stula's treatments notes dated October 2, 2008 and May 8, 2008 also reflect that Mandella's history is that she presents herself with complaints of mood swings, depression, difficulty concentrating, migraine headache, morning and evening fatigue. (Tr. 421–22.) This "history" appears to encompass presenting symptoms throughout Dr. Stula's treatment of Mandella. In addition, the ALJ's reasons for rejecting Dr. Stula's opinion is the equivalent of saying that one must "look" fatigued to be suffering from CFS. Certainly, this reasoning is flawed. All in all, the ALJ's opinion that Dr. Stula never observed that Mandella looked tired or that her mood was depressed is unsound.

Second, the record suggests that the ALJ ignored laboratory evidence supporting the severity of Mandella's CFS. The record demonstrates that Mandella tested positive for an elevated antibody titer to EBV in November 2006. (Tr. 404.) Had the ALJ accounted for this laboratory finding (which is sufficient for establishing the existence of a medically determinable impairment in individuals with CFS), he could have never reached the conclusion that "Dr. Stula failed to provide objective medical evidence in the form of examination findings," and that "Dr. Stula did not otherwise provide supportive subsequent evidence referencing clinical findings or otherwise explain its basis." (Tr. 18–19.) There is simply no logical bridge between the evidence and the ALJ's conclusion that Dr. Stula's diagnosis of CFS was not supported by objective clinical findings.

In light of the multiple treatment notes reflecting a diagnosis of CFS, depression, and bipolar, and in light of Mandella's positive EBV testing, the ALJ's reasons for rejecting Dr. Stula's opinion are not supported by substantial evidence.

### 5. Medical Consultant

■ Instead of relying on Mandella's treating physicians, the ALJ relied on the opinion of the state agency psychologist, Kenneth E. Sherry, Ph.D. Because Dr. Sherry met with Mandella on only one occasion, and it was in December 2006, his review of Mandella's treatment record was limited. That is to say, he did not have the benefit of reviewing her treatment records from the next twenty-six-month period. It is likely that a review of such records would have affected the state agency reviewer's assessment of Mandella's functional capacity. Although an ALJ may give weight to consultative opinions, here, the ALJ did not adequately explain why Dr. Sherry's opinions were entitled to

greater weight than those of Drs. Burgarino, Agbuis, Kurter, and Stula.

In light of these errors, the ALJ must reevaluate whether the opinions of Drs. Burgarino, Agbuis, Kurter, and Stula are entitled to controlling weight. Upon re-evaluation, if the ALJ determines that the opinions of Mandella's treating physicians are not entitled to controlling weight, the ALJ must evaluate the weight to be given to the opinions of Drs. Burgarino, Agbuis, Kurter, and Stula, pursuant to 20 C.F.R. § 404.1527(d).[9]

### B. ALJ's RFC Determination

SSR 96–8p, 1996 SSR LEXIS 5, requires an ALJ to determine a claimant's RFC by examining "an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." It further explains that "[a] 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.*

Mandella's argument that the ALJ erred in determining her RFC is two-fold. First, Mandella argues that the ALJ's finding that she would have no difficulties relating appropriately to coworkers and supervisors in a workplace environment (if motivated) is not supported by substantial evidence. Second, Mandella argues that the ALJ failed to properly evaluate her CFS.

■ Because the ALJ made an error of law with regard to the opinions of Drs. Burgarino, Agbuis, Kurter, and Stula, as discussed above, the ALJ must reevaluate his determination of Mandella's RFC. After accurately evaluating the opinions of Drs. Burgarino, Agbuis, Kurter, and Stula, the ALJ should determine whether the RFC has changed and, based on this new RFC, whether Mandella would be capable of performing "a full range of work at all exertional levels, with no exertional limitations, but with sufficient ability to understand, remember and carry out instructions of moderate complexity," including the ability to respond appropriately to supervisors and coworkers "if she was so motivated." (Tr. 20.) Thus, this issue must be remanded for further analysis.

### C. Adverse Credibility Determination

■ When a claimant testifies regarding symptoms from his impairment, the ALJ must evaluate the credibility of the claimant's testimony. 20 C.F.R. § 404.1529(c); *see also* SSR 96–7p. A credibility finding is entitled to deference and will only be disturbed if "patently wrong" in light of the record. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir.2000). Despite this deferential standard, "the ALJ must consider the claimant's level of pain, medication, treatment, daily activities, and limitations, 20 C.F.R. § 404.1529(c), and must justify the credibility finding with specific reasons supported by the record, *Villano [v. Astrue]*, 556 F.3d [558, 562 (7th Cir.2009) ]." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir.2009); *see also* SSR 96–7p (listing the seven fac-

**9.** Had the ALJ correctly determined that Mandella's physicians' opinions were not entitled to controlling weight, he still erred by not assessing what weight these opinions did merit. Upon review the record, it is not clear what weight, *if any*, the ALJ attributed to the assessments of Mandella's treating sources. Given that there were four treating physicians, three of which were specialists, and that they all examined the plaintiff over a period of years, and given the treating source opinions' consistency with the record as a whole, the checklist of factors to be weighed appear to support the conclusion that their opinions should be given great weight unless they were seriously flawed. The consultant did not identify a flaw in the treating physicians' analysis, nor could he have because his report pre-dated much of Mandella's treatment history.

tors a decisionmaker must consider when evaluating the claimant's credibility).

Mandella argues that the ALJ erroneously found that her testimony was not credible. Specifically, Mandella argues that the "ALJ's extremely brief (and selective) discussion of ADLs fails to build an 'accurate and logical bridge' to support his conclusions that [her] ADLs support the ALJ's RFC for [her] and undercut [her] credibility." (Pl.'s Br. 11.) Mandella also contends that the ALJ failed to consider the adverse effects of drowsiness/sedation of her medications. (Pl.'s Br. 11.)

For the reasons stated previously, the ALJ's credibility determination was patently wrong. His credibility determination was intertwined with one of his reasons for refusing to give controlling weight to Dr. Agbuis's opinion. I will not rehash why the ALJ's adverse credibility determination was not supported with specific reasons supported by the record, in accordance with SSR 96–7p. Thus, this issue must also be remanded for further analysis.

**D. Remedy**

 Mandella argues that the ALJ's decision should be remanded for an award of benefits. Generally, when an ALJ's decision is reversed, the remedy is a remand for further proceedings. There are two exceptions to the general rule: (1) "where the record overwhelmingly supports a finding of disability"; and (2) "where the delay involved in repeated remands has become unconscionable, or the agency has displayed obduracy in complying with the law as set down by the court." *See Worzalla v. Barnhart*, 311 F.Supp.2d 782, 800 (E.D.Wis.2004). Neither exception applies here. The evidence supporting Mandella's claim is not overwhelming. Here, the ALJ's decision is being reversed because he failed to properly evaluate the evidence, and therefore, the ALJ should be given the opportunity to re-consider the matter in light of the foregoing discussion. Because this is Mandella's first § 405(g) appeal and because there is no indication that the SSA refused to apply the law to her claim, the second exception is also inapplicable. Therefore, the cumulative effect of the ALJ's errors warrants a remand under sentence four of § 405(g), without an award of benefits.

**NOW THEREFORE IT IS OR-DERED** that the plaintiff's action seeking review of the Commissioner's decision is **GRANTED;**

**IT IS FURTHER ORDERED** that the decision of the Commissioner be and hereby is **REVERSED** and this matter is **RE-MANDED** for further proceedings consistent with this decision;

**IT IS FURTHER ORDERED** that the clerk of court enter judgment accordingly.

**SO ORDERED.**