In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-2487

SHIRLEY SCOTT,

*Plaintiff-Appellant,*

*v.*

MICHAEL J. ASTRUE, Commissioner of Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 5882—**Sidney I. Schenkier**, *Magistrate Judge.*

ARGUED NOVEMBER 9, 2010—DECIDED AUGUST 1, 2011

Before POSNER, TINDER, and HAMILTON, *Circuit Judges.*

TINDER, *Circuit Judge.* Shirley Scott applied for disability insurance benefits and supplemental security income, claiming that she is disabled by bipolar disorder and numerous physical impairments. The Social Security Administration ("SSA") denied her claim, and a magistrate judge, presiding by consent, upheld the decision. Scott contends on appeal that the Administrative Law Judge ("ALJ") wrongly discounted the opinion of

her treating psychiatrist and discredited her own testimony, and that these mistakes caused the ALJ to overstate her residual functional capacity ("RFC"). We vacate the magistrate judge's decision and remand with instructions that the case be returned to the SSA for additional proceedings.

## I. Background

Scott, who is now 56 years old, suffers from mental impairments as well as back and knee pain. Her physical problems took center stage beginning on New Year's Eve in 2000, when she tripped on some stairs and landed on her back. For ten months afterward she endured persistent back pain that eventually made it impossible for her to continue performing the duties of her job as a nursing home assistant, which required that she lift and transport elderly residents. So Scott gave up her job, moved in with her daughter, and filed an application for disability benefits that was denied in February 2005. Then in August 2005 her knees gave out, and she fell down a second set of stairs and further injured her back. She went to the emergency room, but x-rays confirmed that nothing was broken and no immediate surgery was necessary. After that incident she reapplied for disability benefits, and this second application is the one before us.

In response to Scott's renewed application, a state-agency internist, Dr. Norma Villanueva, examined Scott in December 2005. During the brief, half-hour appointment, Scott told the doctor that she carries a cane for

balance because she has bad knees, and she complained of back pain, arthritis, depression, and vision problems. Scott said that her back had bothered her since 2001 and that her doctor had prescribed a high dosage of ibuprofen, which often is ineffectual. Dr. Villanueva diagnosed Scott with osteoporosis, arthritis, and hypertension but concluded that her musculoskeletal health was "normal." In support of this last conclusion, Dr. Villanueva wrote, "[Scott] uses a cane but can walk normally 50 feet when asked to do so here in the office, without her cane. . . . [R]ange of motion is full." The report says nothing about Scott's ability to lift or carry heavy objects. Although this is the medical evaluation upon which the ALJ ultimately relied in assessing Scott's physical limitations, her medical records are replete with instances in which she complained to other doctors about back and knee pain and said the cane was necessary for balance. Scans and X-rays, however, did show that Scott's knees were normal and that she suffered from only minimal degeneration in her spine.

The state agency also evaluated Scott's mental health in December 2005. Scott complained to Dr. Robert Prescott, a psychologist, about poor memory, bouts of crying, disinterest in activities, and auditory hallucinations. Dr. Prescott observed that Scott displayed a "flat" affect but was oriented to time and place and was able to care for herself; he concluded that Scott was depressed and suffered from some cognitive limitations. A different state-agency psychologist then reviewed Dr. Prescott's report and concluded that Scott faced mild limitations in her abilities to perform daily life activities and main-

tain concentration, persistence, and pace, but was able to function normally in social settings and had not experienced any episodes of decompensation. A state agency medical consultant agreed with this assessment.

In April 2006, Scott had a Comprehensive Mental Health Assessment. She told the examiner that she is perpetually anxious and has trouble sleeping, in part because of the voices she hears. The examiner noted that Scott had difficulty recalling dates, but her judgment was intact. The assessment concluded that Scott was depressed but ruled out major depression, recommending therapy and a psychiatric evaluation.

In June 2006, Scott began therapy with Dr. Christine Tate, a psychiatrist, on a near-monthly basis. In her treatment notes, Dr. Tate documented Scott's complaints that she cried daily and suffered frequent nightmares, paranoia, and periods of insomnia, sometimes lasting more than two days. Dr. Tate also observed that Scott was guarded, spoke quietly and slowly, had poor recall and concentration, and was easily distracted. Tate diagnosed Scott with bipolar disorder and prescribed Abilify and Zoloft, both of which are used to treat bipolar disorder and depression. In May 2007, Scott complained of hand tremors (a common side effect of her medications), so Dr. Tate prescribed a third drug, Cogentin, to reduce the tremors and ordered a neurological consultation to rule out other causes. It appears from the record that the tremors eased with the additional medication, and Scott never went for the neurological consultation.

Dr. Tate also completed a questionnaire about Scott's mental impairments. After more than a year of working with Scott, the psychiatrist reported that Scott's symptoms included tearfulness, auditory hallucinations, paranoia, and difficulty concentrating, and she remarked that Scott had long been a "quiet sufferer of untreated chronic mental illness" even though her mental status was "within normal limits." Dr. Tate opined that Scott would miss work at least three times a month and that she had no ability, or at best a "fair" ability, to perform light work. Dr. Tate concluded that Scott is slightly limited in daily functioning and markedly limited in social functioning; that she frequently experiences deficiencies in concentration, persistence, or pace; and that she suffers from repeated episodes of deterioration and decompensation.

At her hearing before the ALJ, Scott described the impairments she thought would interfere with her ability to work. She explained that her bipolar disorder made her tearful and depressed, caused her to hear imaginary voices, hindered her concentration, and made her feel paranoid. She remarked that, because of these symptoms, she could "hardly keep [herself] together." As examples of how the disorder interferes with her life, Scott said that she often misses her bus stop, fears being followed, and has trouble sleeping. Regarding her physical limitations, Scott told the ALJ that, since her initial stairway fall, she has experienced sharp lower-back pain that lasts days at a time and that is not controlled by prescription-strength ibuprofen. She also repeated that her knees tend to give out, so she carries

a cane. Scott conceded that her prescription for osteoporosis helped her knees but said that she had stopped taking the medication because she could not go to the hospital to get the prescription refilled. (She refilled her other prescriptions at a local pharmacy.) Finally, Scott explained that 2 or 3 times a week her right hand shakes for about 30 minutes, making it hard for her to hold things, and that arm pain makes it impossible for her to lift more than a gallon of milk.

Scott also testified about her daily routine. She told the ALJ that she is able to help her daughter with cooking and some cleaning, but she cannot bend to mop or carry groceries. During the day Scott watches TV, talks on the phone, and reads, but sometimes she cannot concentrate on these activities. Scott told the ALJ that she can stand or sit for 30 minutes at a time, walk 2 blocks without stopping, and climb stairs if she holds onto a railing or uses her cane.

A psychologist, Dr. Ellen Rozenfeld, was present for Scott's testimony and commented on her mental health based on her testimony and an examination of the record. Dr. Rozenfeld remarked that she had seen no evidence in the medical record of manic episodes and thus wondered how Dr. Tate had arrived at her diagnosis of bipolar disorder. Although Dr. Rozenfeld did not rule out the diagnosis, she opined that Scott had a sound ability to remember, reason, and perform basic calculations; that she could engage in a full range of daily activities; and that the record did not support a conclusion that Scott would miss three days of work

a month. Dr. Rozenfeld also surmised that Scott distrusted others but was not paranoid, and that the voices she heard might simply be a byproduct of falling asleep since Scott usually heard them at night. Dr. Rozenfeld concluded that a diagnosis of major depression was appropriate and opined that Scott could follow short, simple instructions but was moderately limited in social functioning and in concentration, persistence, and pace. She also opined that Scott had a marked limitation in her ability to perform complex tasks.

The ALJ then asked a vocational expert ("VE") what jobs Scott could do if she can lift, push, or pull 10 pounds frequently and 20 pounds occasionally; stand or walk for 6 hours; and occasionally climb, balance, stoop, kneel, crouch, and crawl. The ALJ instructed the VE to exclude jobs that involve complicated tasks, a rapid pace, or frequent interaction with others. The VE responded that Scott could not return to her past work but could perform light work as a hotel cleaner or parking-lot attendant. The ALJ then asked the VE to consider the added limitation that Scott must be able to alternate between standing and sitting. The VE concluded that, with that limitation, Scott would be limited to jobs as a parking-lot attendant, of which he estimated there are 2,000 in the regional economy. In both cases, the VE added, Scott would have to concentrate for at least 85% of the time.

The ALJ evaluated Scott's claim under the required five-step analysis, *see* 20 C.F.R. §§ 404.1520, 416.920, and concluded that (1) Scott had not worked since

October 2001; (2) her depression, hypertension, osteo-porosis, and minimal degeneration of her spine constitute severe impairments but the hand tremors do not; (3) these impairments do not collectively meet or equal a listed impairment; (4) Scott has the RFC to perform light work; and (5) based on this RFC she cannot perform her previous job but can do light work as a hotel cleaner and thus is not disabled.

The ALJ rejected Dr. Tate's diagnosis of bipolar disorder, and instead concluded that Dr. Rozenfeld's diagnosis of depression was more consistent with the record. The ALJ refused to credit Dr. Tate on the ground that there is no "objective evidence to support her opinion that [Scott] would be absent more than 3 times a month" and because Dr. Tate's notes reflect a positive response to medication and therapy, undermining the conclusion that Scott is limited in her ability to work.

The ALJ also denied benefits, in part, because she discredited Scott's testimony on "the intensity, persistence and limiting effects" of her symptoms. The ALJ found that Scott had overstated her back and knee pain because she can climb stairs and walk two blocks, and because X-rays of her knees were normal and films of her back showed only minimal degeneration. The ALJ further doubted that the voices Scott was hearing would keep her from working because she "heard voices in the daytime only once." The ALJ also characterized Scott's testimony as inconsistent because she had said that she stopped taking one medicine when she could not travel to get the prescription filled, yet she traveled to see

Dr. Tate and got her prescriptions filled at a local drug-store. The ALJ also concluded that, because Scott recalled the location of that drugstore, her memory is better than she lets on.

## II. Discussion

Scott challenges three aspects of the ALJ's decision, which we review as the final word from the Commissioner because the Appeals Council declined review. *See Getch v. Astrue,* 539 F.3d 473, 480 (7th Cir. 2008). Scott faults the ALJ for crediting Dr. Rozenfeld instead of Dr. Tate regarding her mental impairments, argues that the ALJ's credibility finding is unsupported, and disputes the ALJ's resulting determination that her RFC allows light work. We confine our review to the rationale offered by the ALJ, *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943)), and evaluate whether that decision is supported by substantial evidence without deferring to the district court, *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

As to Scott's first argument, we agree that the ALJ erroneously credited Dr. Rozenfeld's opinion over the views of Dr. Tate in evaluating her mental impairments. A treating doctor's opinion receives controlling weight if it is "well-supported" and "not inconsistent with the

other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *see Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). An ALJ must offer "good reasons" for discounting the opinion of a treating physician. *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011); *Campbell*, 627 F.3d at 306. Here, the reasons the ALJ gave for discounting Dr. Tate's assessment do not meet this standard. The ALJ first relied on Dr. Rozenfeld's conclusion that the medical record contains no evidence of manic episodes and thus cannot support a diagnosis of bipolar disorder, which, by definition, includes both manic and depressive episodes. But the record *does* contain evidence that could be symptomatic of manic behavior. Dr. Tate repeatedly noted that Scott sometimes stays awake for days at a time, has paranoid ideations, is easily distracted, and experiences difficulty concentrating. These symptoms are consistent with manic episodes, *see Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 357-62 (4th ed. 2000), and it is possible that Dr. Tate considered them as such in diagnosing Scott with bipolar disorder.

The ALJ also found Dr. Tate's assessment internally inconsistent because, on the one hand, she opined that Scott is markedly limited in her ability to work and is likely to miss three days of work per month while, on the other hand, she also stated that Scott had responded well to treatment. But the ALJ was too quick to read inconsistency into these statements. There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce, and

that difference is borne out in Dr. Tate's treatment notes. Those notes show that although Scott had improved with treatment, she nevertheless continued to frequently experience bouts of crying and feelings of paranoia. The ALJ was not permitted to "cherry-pick" from those mixed results to support a denial of benefits. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). Moreover, the ALJ's analysis reveals an all-too-common misunderstanding of mental illness. The very nature of bipolar disorder is that people with the disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better or has had a "good day" does not imply that the condition has been treated. *See Punzio*, 630 F.3d at 710; *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008).

And even if there had been sound reasons for refusing to give Dr. Tate's assessment controlling weight, the ALJ still would have been required to determine what value the assessment did merit. *See* 20 C.F.R. § 404.1527(d)(2); *Larson*, 615 F.3d at 751. "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). Here, many of these considerations favor crediting Dr. Tate's assessment: Dr. Tate is a psy-

chiatrist (not a psychologist), she saw Scott on a monthly basis, and the treatment relationship lasted for over a year. It is not apparent that the ALJ considered any of these factors. Based on these shortcomings, we conclude that the ALJ's consideration of Dr. Tate's evaluation is unsatisfactory and requires remand.

The same is true of the ALJ's assessment of Scott's physical impairments. The ALJ asked the VE to consider what jobs would be available to Scott if she can stand for 6 hours in a regular day and lift 10 to 20 pounds, but the ALJ did not identify any medical evidence to substantiate her belief that Scott is capable of meeting those physical requirements. The ALJ *said* that her conclusion is based on Dr. Villanueva's examination, but nothing in that report suggests that Scott can stand for 6 hours or lift up to 20 pounds. Dr. Villanueva noted that Scott successfully walked 50 feet without a cane within the confines of her office, but that brief excursion hardly demonstrates an ability to stand for 6 hours (and neither does Scott's testimony that she could walk 2 blocks). Additionally, there is no evidence in Dr. Villanueva's report that she even tested Scott's ability to lift heavy objects, so the ALJ could not legitimately have relied on that examination to conclude that Scott can occasionally lift 20 pounds. The ALJ needed to explain how she reached her conclusions about Scott's physical capabilities, *see Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005); *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004), but the primary piece of evidence that she relied on does not support the propositions for which it is cited.

We therefore must conclude that the ALJ failed to build the requisite "logical bridge" between the evidence and her conclusion. *See Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

The Commissioner asserts that, apart from one statement at the hearing that Scott was unable to lift more than one gallon of milk, there is no evidence that she has any limitation on her lifting ability, and the ALJ was therefore entitled to determine her RFC without reference to a more-substantial lifting restriction. It is true that Scott bears the burden of producing evidence of her impairments, *see Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008), but she did produce evidence in the form of her own testimony as well as medical evidence that tremors make it difficult for her to use her hands. If the ALJ found this evidence insufficient, it was her responsibility to recognize the need for additional medical evaluations. *See Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003); *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000).

These flaws are enough to require us to remand the case to the Agency for further proceedings. We therefore needn't decide whether the reasons the ALJ gave in support of her adverse credibility finding regarding Scott were so "patently wrong" as to separately require remand. *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). Nonetheless, we point out several of the most serious flaws in the ALJ's credibility assessment so that the SSA does not repeat them on remand. First is the ALJ's

suggestion that Scott's auditory hallucinations won't interfere with her ability to work because she hears voices only at night. The ALJ did not limit Scott to daytime work (parking lots often employ night-time attendants), and this reasoning fails to account for the reality that hearing voices at night could interfere with Scott's ability to sleep and thus her ability to function during the day. Moreover, there must be a *reason* that Scott hears voices, a subject that should be explored rather than used as a reason to doubt her credibility. Also troubling is the ALJ's finding that when Scott testified she must have exaggerated her difficulties with concentration and memory since she was able to recall the location of the pharmacy that she regularly utilized. Drs. Prescott, Tate and Rozenfeld did not dispute Scott's complaints about memory and concentration problems, and her husband also provided corroborating testimony. That Scott can find her way back to a pharmacy to fill needed prescriptions is hardly enough to discount concerns about her memory *and* concentration.

### III. Conclusion

The judgment affirming the denial of benefits is VACATED and the case is REMANDED with instructions that it be returned to the SSA for further proceedings consistent with this opinion.