**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued August 8, 2012
Decided October 3, 2012

**Before**

WILLIAM J. BAUER, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

| | |
|---|---|
| No. 12-1653 | |
| | Appeal from the United States District Court |
| KENDALL PARROTT, | for the Northern District of Illinois, Eastern |
| *Plaintiff-Appellant*, | Division. |
| | |
| *v.* | No. 11 C 2324 |
| | |
| MICHAEL J. ASTRUE, | James B. Zagel, |
| Commissioner of Social Security, | *Judge.* |
| *Defendant-Appellee*. | |

**O R D E R**

Kendall Parrott applied for disability insurance benefits under Title II of the Social Security Act, claiming that a combination of impairments left him unable to work. Because he has since resumed working, his claim for benefits is now for a closed period running from the alleged onset date of his disability, August 2007, to March 2011, when he

successfully completed a trial period at his new job.[1] Slightly complicating matters is that in October 2008 Parrott turned 50 years old, triggering a more forgiving definition of disability. (The regulations provide that in general, a claimant who is between 50 and 54 is disabled if he cannot do his past work, is confined to sedentary work, and has no transferrable skills, while an otherwise identical person under 50 is not disabled. *See* 20 C.F.R. Pt. 404, Subpt. P., App. 2, Rule 201.14.) We conclude, however, that substantial evidence supports the ALJ's determination that Parrott was not disabled at any time during the closed period, including after his 50th birthday, and so we affirm the judgment of the district court.

Parrott has numerous medical issues. He has a seizure disorder, type II diabetes, degenerative disc disease, depression, and an anxiety disorder. In 2004 he had surgery to remove an acoustic neuroma[2] that was causing him headaches and problems with balance and hearing, and the surgery, though otherwise successful, left Parrott with mild, permanent hearing loss in one ear. None of these health problems caused Parrott to leave his job as director of the park district in suburban Harvey, Illinois, where he had begun working in the 1990s.

Then, in August 2007 Parrott and two other park-district employees were arrested and charged with wire fraud for misusing district credit cards. They were fired for this misconduct. Parrott became suicidal and was admitted to the hospital for a week. Three months later he was again feeling suicidal and was admitted for a few days.

Parrot applied for disability benefits at the end of 2007, alleging an onset date of August 2007. He contended that his combination of headaches, diabetes, back pain, poor hearing, depression and anxiety, and neurological issues left him unable to hold a full-time job. His claim was denied, and he requested a hearing in front of an administrative law judge. Meanwhile, Parrott entered into a plea bargain with the United States to settle his criminal case and received probation.

---

[1]A trial period is permitted so that beneficiaries can test whether they are still disabled. The disability is understood to last until the trial period has been completed. *See* 20 C.F.R. § 404.1592.

[2]An acoustic neuroma is a benign tumor growing on the nerve connecting the ear and the brain. *See Acoustic Neuroma*, MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/acousticneuroma.html (last visited Sept. 20, 2012).

At his disability hearing in 2009, Parrott testified that he is unable to stand for more than two hours a day because of back and leg pain. He also described having constant headaches, difficulty hearing, memory problems, depression, and balance issues.

A psychologist, Dr. Larry Kravitz, reviewed Parrott's mental-health records and testified as an expert that Parrott suffers from major depressive disorder and an anxiety disorder but that he has been relatively stable since the resolution of his legal problems. Dr. Kravitz assessed Parrott as able to interact with coworkers, superiors, and the public, at least under minimally stressful conditions.

A vocational expert also testified at the hearing, explaining that Parrot's work for the park district was light, skilled work. The ALJ asked the vocational expert whether someone with Parrott's age, education, work experience, and limitations could perform Parrott's past work as a park-district administrator. The ALJ described Parrott as (1) having some college education but no degree; (2) confined to light work with no kneeling, crouching, or crawling; (3) able to interact with coworkers and the public, but not handle conflict (such as "taking customer complaints"); and (4) able to complete "detailed, but not complex tasks." The expert said she did not think such a person could do Parrott's past work.

The ALJ then asked whether Parrott would have developed skills that could be transferred to another skilled job, and the vocational expert replied that Parrott would have developed the transferable skills of "speaking, writing, coordinating; adjusting actions in relation to others; active listening; problem identification; information gathering." These skills, the expert said, would allow him to work as a cashier in a hotel or similar business or as a residence supervisor. The expert testified that these jobs also would be available to an individual confined to sedentary work rather than light work. The ALJ did not ask the expert whether these jobs were available to someone with partial hearing loss in one ear.

In the ALJ's decision, she found at step one of the familiar five-step sequential analysis that Parrott was not engaged in gainful employment. At step two she found that he was suffering from the following severe, medically determinable impairments: "status post acoustic neuroma removal, degenerative disc disease, diabetes, major depressive disorder, anxiety disorder." At step three she found that none of Parrott's impairments met a listing.

The ALJ next assessed Parrott's residual functional capacity ("RFC"), as required before moving on to step four. She began her analysis by explaining that Parrott's testimony about his symptoms was "not fully credible." He had described "constant" headaches during the hearing, though his medical records reflected that he complained of having only occasional headaches, and he had testified that he searched for full-time work after he was

fired, which suggested to the ALJ that Parrott's unemployment was unrelated to his health problems.

She also discussed the report of Parrott's primary physician, Dr. Albert Reynolds, who opined that Parrott could not stand or walk for more than two hours a day and that he suffered from neurological, auditory, visual, and manipulative limitations that precluded full-time work. The ALJ gave this report "no weight" because Dr. Reynold's assessment of Parrott's manipulative limitations was unexplained and was contradicted by Parrott himself, who denied having trouble using his hands. Additionally, the standing and walking limitations that Dr. Reynold's identified were, the ALJ pointed out, contradicted by the objective evidence that Parrott's gait was normal. The ALJ did, however, credit a post-hearing report from Parrott's neurologist, Dr. Kevin Fagan, who explained that Parrott exhibited "Babinski's sign," an abnormal reflex. *See Babinski's Reflex*, MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/ency/article/003294.htm (last visited Sept. 20, 2012).

In regard to Parrott's mental health, the ALJ concluded that Parrott could do "detailed but not complex" tasks and could interact with the public under minimally stressful circumstances. She gave the expert testimony of Dr. Kravitz "very significant weight" because he was able to consider all of the evidence in the record, but she gave "little weight" to the opinion of Dr. Rian Rowles, the physician who was treating Parrott's mental-health problems. Dr. Rowles had pointed to Parrott's past suicidal ideation as evidence that he could not hold a full-time job, but his own treatment notes documented significant improvement in Parrott's mental health after his legal troubles were resolved. The ALJ also noted that Parrott suffers from mild hearing loss in one ear but that he had no difficulty hearing during the administrative hearing.

Based her analysis of the evidence, the ALJ determined that Parrott's RFC limits him to sedentary work. She then concluded at steps four and five of the sequential analysis that Parrott could not perform his past work but could do the skilled, sedentary jobs that the vocational expert had identified—cashier in a hotel or similar business and residential supervisor—and that these jobs exist in significant numbers in the economy. The ALJ agreed with the vocational expert that Parrott had developed the transferable skills of "speaking, writing, coordinating, adjusting his actions in relation to others, active listening, problem identification, and information gathering." Possessing these transferrable skills, Parrott was not disabled despite having reached the age of 50. *See* 20 C.F.R. Pt. 404, Subpt. P., App. 2, Rule 201.14.

After the Appeals Counsel upheld the ALJ's decision, Parrot brought this action in district court. The district court upheld the agency's decision, and Parrot appealed. Our

review is confined to determining whether the ALJ supported her decision with substantial evidence. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).

On appeal Parrot argues that the ALJ erred by accepting the vocational expert's assertion that Parrott had developed skills in his past work that could be transferred to a skilled sedentary job. He first contends that the interpersonal, analytical, and supervisory abilities that the expert identified as vocational skills are merely aptitudes, comparable to "judgment," which this court has concluded is not a vocational skill. *See Villano v. Astrue*, 556 F.3d 558, 563–64 (7th Cir. 2009). He also compares the identified skills to those abilities the Second Circuit has concluded do not qualify, for example, "the ability to change easily and frequently from one activity to another." *See Draegert v. Barnhardt*, 311 F.3d 468, 469 (2d Cir. 2002) (quotation marks omitted). The government responds that the vocational expert was clearly talking about advanced communication skills developed over time rather than the standard ability to speak and listen.

A vocational skill is defined in SSR 82-41 as "knowledge of a work activity. . . that goes beyond the carrying out of simple job duties and is acquired through the performance of an occupation which is above the unskilled level (requires more than 30 days to learn)." A skill is transferable if it "can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work." 20 C.F.R. § 404.1568(d)(1). We conclude that the advanced communication and supervisory skills that Parrott would have developed as a park-district director are vocational skills within the meaning of the Social Security Act and could be transferred to other jobs. *See, e.g.*, *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 857 (6th Cir. 2010) (agreeing with ALJ that supervisory skills are vocational skills that are transferrable between industries); *Albors v. Sec'y of Health & Human Servs.*, 817 F.2d 146, 148 (1st Cir. 1986) (distinguishing between the mere ability to communicate and the transferrable communication skills possessed by executives).

Parrott next argues that even if he did develop vocational skills as park-district director, a skill is not transferable to a new job if the claimant's impairments prevent him from actually using it. According to Parrott, his mental instability renders him incapable of using the skills he developed at the park district. A skill no longer possessed obviously cannot be transferred to a new job. *See* SSR 82-41(4)(b) (giving as examples "watchmakers with hand tremors, house painters with severe allergic reactions to paint fumes, craftsmen who have lost eye-hand coordination, construction machine operators whose back impairments will not permit jolting, and business executives who suffer brain damage which notably lowers their IQ's"). But substantial evidence supports the ALJ's conclusion that Parrott's mental state improved greatly after his legal problems were resolved.

In a related argument, Parrott contends that the ALJ should not have relied on the vocational expert's opinion about the transferability of his skills because the ALJ failed to include all of Parrott's limitations in the hypothetical she presented to the expert. Specifically, Parrott says, the ALJ did not include that he is "moderately limited as to concentration, persistence, and pace," or that he suffers from partial hearing loss in one ear. Hypotheticals posed to vocational experts must include all impairments that are established by the record and accepted by the ALJ as credible. *See Simila v. Astrue*, 573 F.3d 503, 520–21 (7th Cir. 2009); *Young v. Barnhardt*, 362 F.3d 995, 1004 (7th Cir. 2004).

The government counters that the ALJ did include Parrott's concentration and pace limitation in the hypothetical when she asked the vocational expert to assume that Parrot could not do complex tasks. We agree. In addition, the ALJ found that Parrott's mild hearing loss in one ear did not impair his ability to function normally; thus, the hypothetical presented to the vocational expert did not need to include hearing loss.

Finally, Parrott argues that the ALJ erred by not giving controlling weight to his treating physician's assessment of his impairments. A treating physician's opinion controls unless it is "inconsistent with the other substantial evidence." *See* 20 C.F.R. § 404.1527(c)(2); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). In this case, the ALJ reasonably concluded that Dr. Reynold's opinion was inconsistent with the objective evidence and with Parrott's own account of his abilities. Our job is not to reweigh that evidence. *See Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

Accordingly, the judgment of the district court is **AFFIRMED**.