[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-14455
Non-Argument Calendar

_____

D.C. Docket No. 1:17-cv-22604-DPG


MILKA ELENA CASTRO,

Plaintiff-Appellant,

versus

ACTING COMMISSIONER OF SOCIAL SECURITY,
Nancy A. Berryhill,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 29, 2019)

Before TJOFLAT, JORDAN and JILL PRYOR, Circuit Judges.

PER CURIAM:

Milka Elena Castro appeals the district court's order affirming the decision of the Commissioner of the Social Security Administration to deny her application for benefits.  On appeal, she argues that the administrative law judge ("ALJ") erred in assessing her residual functional capacity because the ALJ gave only partial weight to the opinions of Dr. Hamlet Hassan, her treating psychiatrist.  Because the ALJ's decision to give less than great weight to Hassan's opinions is not supported by substantial evidence, we reverse the district court's judgment and remand to the district court with instructions to remand to the Commissioner.

## I.    FACTUAL BACKGROUND

Castro applied for disability insurance benefits, a period of disability, and supplemental security income, claiming that she was disabled due to various physical and psychological impairments.[1]  After her application was denied, Castro received a hearing before an ALJ.

## A.    The ALJ Hearing

At the hearing, the ALJ heard testimony from Castro about her limitations and from a vocational expert.  The ALJ also reviewed other evidence, including a questionnaire that Castro had completed about her limitations, records from

---

[1] Because Castro's arguments on appeal relate to the ALJ's assessment of her limitations due to her psychological impairments, we discuss the evidence related to these impairments only.

Castro's medical providers, and the opinions of state agency consultants who had reviewed Castro's medical records.

### 1.    Castro's Testimony

Castro testified that she lived with her husband and two children.  She previously worked in a clothing store where her duties included changing lightbulbs, stocking merchandise, and cleaning the bathroom.  But she quit the job due to her physical and psychological limitations.

In her testimony, Castro described how her anxiety and depression limited her daily activities, leaving her unable to do much beyond sleeping and eating.  On a typical day, she would wake up around noon, eat a little, and then go back to bed.  She would spend most days at home alone crying.  She had little appetite and had lost approximately 20 pounds.  Her hobby used to be cleaning, but she was no longer able to clean.  She cooked "just a little bit" and depended on her mother, sister, and husband to cook for her family and clean her home.  Doc. 13 at 56.[2]  She did not like to watch television because she was unable to concentrate or follow the plot.

Castro also testified that she engaged in limited social activities because she experienced panic attacks and felt suffocated and irritated when she was around

---

[2] "Doc. #" refers to the numbered entries on the district court's docket.

other people.  As a result, she would not go to the grocery store and avoided talking to friends on the phone.  She nonetheless went to church once a week.

### 2.    Castro's Questionnaire

Besides hearing Castro's testimony, the ALJ also reviewed a questionnaire that Castro completed around the time she applied for benefits in which she described how her anxiety and depression limited her activities.  In the questionnaire, Castro indicated that she experienced panic attacks when she was around other people.  In addition, due to her obsessive-compulsive disorder, she felt compelled to check her work multiple times, leaving her unable to work efficiently.

Castro also described her daily activities.  She usually would engage in personal grooming but needed to be reminded to do so.  Although she previously cooked daily, she was able to cook only twice a week for about two hours at a time.  She could complete light household chores—like making the bed, washing dishes, and tidying up—only about twice a week for two to three hours at a time.  And she would need help or encouragement to cook or clean.

Castro also provided information about her social activities.  She reported having problems socializing and getting along with friends, families, and neighbors.  In particular, if a person was talkative, she would experience panic attacks or mood changes.  About once a week, she received visitors and twice a

4

week attended church.  She did not need anyone to remind her to go to church or to accompany her.

Castro also reported other information about how her limitations affected her abilities.  She indicated that she could pay attention for only about 15 minutes.  She could follow simple directions, but if the directions were too complex, she would experience a panic attack.  She could not handle stress well and became confused when her routine changed.

### 3.    Castro's Medical Records

The ALJ also reviewed Castro's medical records, which included records from Hassan, Castro's psychiatrist who treated her for several years.  At her initial appointment with Hassan, Castro stated that she repeatedly checked the same things and performed repetitive routines and rituals without control of her thoughts or behavior.  She reported feeling depressed, lonely, hopeless, helpless, sad, anxious, and irritable.  Hassan noted that Castro had poor concentration but found that her thought process was intact.  He diagnosed her with obsessive-compulsive disorder and prescribed her anti-depressant and anti-anxiety medications.  He determined that her Global Assessment of Function ("GAF") score was 49.[3]

---

[3] The GAF is a standard measurement of an individual's overall functioning "with respect only to psychological, social, and occupational functioning" using a 1 to 100-point scale. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32-33 (4th ed. 2000) ("DSM-IV").  According to the DSM-IV, a GAF rating in the range of 41-50 indicates that the person has either serious symptoms—such as suicidal ideation or severe

At her second appointment, Castro reported feeling better about her obsessive-compulsive disorder but stated that the medication had not helped and made her angry.  Based on this report, Hassan changed Castro's medications.  He also observed that she was acting depressed and anxious during the appointment and diagnosed her with major depressive disorder.  At her next appointment, Castro reported experiencing depression and anxiety and feeling apprehensive and irritable.  In his notes, Hassan indicated that Castro had no behavior issues and good judgment, and he assigned her a GAF score of 55.

Several weeks later, Castro was admitted to the hospital for depression and suicidal ideation.  The ALJ reviewed the records from her hospital admission.

---

obsessional rituals—or a serious impairment in social, occupational, or school functioning—such as no friends or an inability to keep a job.  *Id.*

The more recent edition of the DSM, however, abandoned the use of GAF scoring, noting "its conceptual lack of clarity" and "questionable psychometrics in routine practice."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013) (DSM-V).  After the DSM-V was published, the Social Security Administration issued a directive to its ALJs instructing them to consider GAF scores as medical opinion evidence but emphasizing that a claimant's GAF scores should not be considered in isolation.  The directive stated:

> The GAF is unlike most other opinion evidence we evaluate because it is a rating. However, as with other opinion evidence, a GAF needs supporting evidence to be given much weight.  By itself, the GAF cannot be used to "raise" or "lower" someone's level of function.  The GAF is only a snapshot opinion about the level of functioning.  It is one opinion that we consider with all the evidence about a person's functioning.  Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.

Soc. Sec. Admin., Administrative Message 13066 (July 22, 2013).

When she was admitted, she reported having difficulty sleeping and concentrating as well as suicidal ideation. She also indicated that she had less energy. The treating physician noted that she exhibited signs of moderate depression, had a glum demeanor, and appeared listless and downcast. The physician observed that Castro's thinking appeared slowed and that she had disorganized behavior, an inappropriate affect, and illogical reasoning. The physician also wrote that she expressed paranoid ideas and her social judgment appeared to be poor.

The physician performed a psychological assessment. During the assessment, Castro was able to recall the date and her birthdate, define words, perform simple math, explain the meaning of a proverb, describe the similarities between arm and leg and tall and short, identify basic items by name, and recall three words that she was asked to remember. To test her judgment and comprehension, the physician asked her why people said hello to a cashier at a store. Because she gave a correct response, the physician concluded that Castro had good judgment and comprehension. The physician determined that her GAF score was 30. Because Castro was able to function at a "baseline level," she was discharged. Doc. 13 at 393.

Approximately ten days after being released from the hospital, Castro appeared for a follow-up appointment with Hassan. She complained of panic attacks and was nervous and tearful during the appointment but denied suicidal

ideation.  At the appointment, her thought process was logical, and her insight and judgment were fair.  Hassan assigned her a GAF score of 55.

Over the next few appointments, Castro's condition fluctuated.  At her next appointment, she reported a "little improvement in her mood" and that she had experienced no panic attacks for two weeks.  *Id.* at 550.  Hassan also noted that she appeared less anxious and assigned her a GAF score of 59.  But at her following appointment, Castro stated that she was frequently crying and reported feeling depressed, anxious, and worthless.  She had a disheveled appearance, was experiencing insomnia, and reported passive death wishes.  Hassan noted that she lacked concentration and attention, her insight was poor, and her judgment was fair.  This time he assigned her a GAF score of 53 and changed her medications.  At her next appointment, Castro reported experiencing less frequent and intense episodes of depression.

After treating Castro for nearly a year, Hassan completed an assessment form evaluating her ability "to do work-related activities on a day-to-day basis in a regular work setting."  *Id.* at 554.  Among other things, he opined that she had no useful ability to function independently.  He reported that her ability to do the following was poor: deal with the public, deal with work stress, maintain attention and concentration, carry out detailed or complex job instructions, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate

8

reliability.  Hassan concluded that Castro had "severe problems" and would be unable to function appropriately "in a regular environment," and thus she could not maintain a job.  *Id.* at 554-55.

After completing the assessment form, Hassan continued to treat Castro, seeing her regularly.  At some appointments, he indicated that her condition was improving or that her levels of anxiety and depression were decreasing.  But at other appointments, Hassan observed that Castro's levels of anxiety and depression were increasing and that her activities of daily living were worsening.

Approximately two years after completing the first assessment form, Hassan completed a second assessment form rating Castro's ability to do activities on a day-to-day basis in a work setting.  Most of Hassan's assessments remained the same.  But this time he opined that Castro had no useful ability to deal with the public, deal with work stress, or demonstrate reliability.[4]  To support his assessment, he explained that she had "chronic severe depression" with a "poor to fair response" to medications and treatment.  *Id.* at 646.

---

[4] Nonetheless, Hassan noted that Castro's abilities in two areas had improved.  In the first assessment, he had determined that she had no useful ability to function independently and a poor ability to carry out detailed job instructions, but in the second assessment he opined that she had a fair ability in each of these areas.

4.     **State Agency Consultants' Opinions**

The ALJ also reviewed opinions about Castro's psychological limitations from two state agency consultants who reviewed her medical records but never treated or examined her.[5] The first consultant, Arthur Hamlin, Psy.D., provided his opinion before Castro was admitted to the hospital for suicidal ideation and before Hassan completed either assessment form. After reviewing records from Castro's first several appointments with Hassan, Hamlin opined that she had mild restrictions in activities of daily living and moderate difficulties in social functioning. He concluded that she had no problems recalling detailed instructions and was not significantly limited in carrying out detailed instructions, sustaining an ordinary routine without special supervision, making simple work-related decisions, or interacting appropriately with the public. But he indicated that she would have moderate limitations in maintaining attention and concentration for extended periods and in responding appropriately to changes in the workplace setting. Hamlin also found that due to her history of panic and anxiety, Castro would need a setting with reduced social interactions.

A second state agency consultant, Kathryn Bell, Ph.D., offered an opinion based on her review of Castro's medical records. Bell provided her opinion after

---

[5] A third state agency consultant, Dr. P.S. Krishnamurthy, offered an opinion about Castro's physical residual functional capacity. Because the opinions related to her physical limitations, we do not discuss them.

Castro was admitted to the hospital for suicidal ideation and depression but before Hassan had completed either assessment form. Bell opined that Castro had mild restrictions in her activities of daily living and moderate restrictions in maintaining social functioning and concentration, persistence, or pace. She found that Castro had no significant limitations in remembering short and simple instructions but moderate restrictions in remembering and carrying out detailed instructions. She also determined that Castro was moderately limited in her abilities to maintain attention and concentration for extended periods, interact appropriately with the general public, get along with her coworkers and peers, and respond appropriately to changes in the work setting.

### 5.    The Vocational Expert's Testimony

At the hearing, the ALJ also heard testimony from a vocational expert. The ALJ asked the vocational expert what work a hypothetical person with Castro's age, education, and past work history could perform if she were limited to sedentary work that involved simple, routine, and repetitive tasks; was not at production-rate pace; and entailed no interaction with the public. The vocational expert opined that such a hypothetical person could not perform Castro's past work but could perform the jobs of table worker, final assembler, or semi-conductor bonder.

Castro's counsel then asked the vocational expert what work a hypothetical person could perform if she had the limitations identified in Hassan's first assessment, including that the person had no useful ability to function independently and a poor ability to deal with the public, deal with work stress, and maintain attention or concentration. The vocational expert answered that there was no work such a person could perform. Castro's counsel then asked the vocational expert what work a hypothetical person could perform if she had the limitations identified in Hassan's second assessment—meaning the person had no ability to deal with work stress or the public and a poor ability to relate to coworkers, use judgment, interact with supervisors, and maintain attention or concentration. The vocational expert again responded that there was no work such a person could perform.

## B.    The ALJ's Decision

In a written decision, the ALJ applied the five-step sequential evaluation process and determined that Castro was not disabled. At the first step, the ALJ found that she had not engaged in substantial gainful activity since the alleged onset-of-disability date. At the second step, the ALJ concluded that she had severe impairments, including depression, obsessive-compulsive disorder, and anxiety. At the third step, the ALJ found that Castro had no impairment or combination of impairments that met or medically equaled the severity of a listed impairment.

At step four, the ALJ assessed Castro's residual functional capacity, finding that she could perform sedentary work subject to certain limitations. In relevant part, the ALJ found that she was limited to performing simple, routine, and repetitive tasks that were not at a production-rate pace; was limited to having occasional interaction with supervisors and coworkers; and was precluded from any interaction with the general public.

In reaching this conclusion, the ALJ gave great weight to a portion of Hassan's opinions and less weight to the rest. From the first assessment, the ALJ gave great weight to Hassan's opinions that Castro had a poor ability to deal with the public but a fair ability to relate to coworkers, interact with supervisors, follow work rules, and use judgment. Great weight also was given to Hassan's opinions that she had a fair ability to understand, remember, and carry out simple instructions and a poor ability to understand, remember, and carry out detailed or complex instructions. The ALJ explained that these portions of Hassan's opinions were consistent with his treatment notes and the medical record as a whole.

The ALJ gave less weight to Hassan's other opinions in the first assessment, including the opinions that Castro had no ability to function independently or maintain attention or concentration. In particular, the ALJ found that these opinions were inconsistent with Castro's statements that she was able to cook, clean, go to church, and leave her home unaccompanied as well as Hassan's

13

treatment records where he noted that she had fair judgment, insight, thought process, and thought content.[6]

With respect to Hassan's second assessment, the ALJ again gave great weight to some of Hassan's opinions and partial weight to the remaining opinions. The opinions to which the ALJ gave great weight included that: Castro had no ability to deal with the public; a poor ability to relate to coworkers and interact with supervisors; a fair ability to function independently; a fair ability to understand, remember, and carry out simple instructions; and a poor ability to understand, remember, and carry out complex instructions.

But the ALJ gave the remainder of Hassan's opinions only partial weight, finding that they were inconsistent with the objective medical record and the record as a whole. In particular, according to the ALJ, these opinions were inconsistent with treatment notes from Hassan and the hospital admission records, which indicated that Castro had good judgment, comprehension, insight, thought process, and thought content and that her condition improved during treatment.

---

[6] The ALJ stated that Hassan opined that Castro had no ability to maintain attention or concentration. But the ALJ's characterization of Hassan's opinion was inaccurate. In the first assessment, Hassan opined that she had a "poor" ability to maintain attention or concentration, meaning her ability to function in this area was "seriously limited but not precluded." Doc. 13 at 554. The ALJ offered no explanation as to how this opinion was inconsistent with Castro's statements that she occasionally could cook, clean, go to church, or leave her home unaccompanied.

The ALJ next addressed the opinions from Hamlin and Bell, the state agency consultants, generally giving them great weight.[7]  The ALJ found that these opinions were consistent with the objective medical evidence and Castro's statements about her abilities.

The ALJ also discussed Castro's GAF scores.  After acknowledging that a GAF score can offer some evidence regarding the severity of a claimant's mental impairment, the ALJ gave little weight to Castro's GAF scores, explaining that each score was a mere snapshot of her ability to function at the particular time of the assessment and did not include a function-by-function assessment of her ability to perform specific work-related activities.

Based on Castro's residual functional capacity, the ALJ found that she was unable to perform her past relevant work.  At step five, the ALJ determined that given Castro's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could perform, including table worker, final assembler, and semi-conductor bonder.  The ALJ thus determined that she was not disabled.[8]

---

[7] The ALJ did not give great weight, however, to Hamlin's opinion that Castro was capable of following multi-step instructions.

[8] Castro requested that the Appeals Council review the ALJ's decision, but the Appeals Council denied her request for review.

15

## C.    District Court Proceedings

Castro then filed an action in federal district court asking the court to reverse the Commissioner's decision.  The magistrate judge issued a report and recommendation that the district court affirm the Commissioner's decision.  Castro objected.  The district court overruled the objection, adopted the report and recommendation, and affirmed the ALJ's decision.  This is Castro's appeal.

## II.    STANDARD OF REVIEW

When, as here, an ALJ denies benefits and the Appeals Council denies review, we review the ALJ's decision as the Commissioner's final decision.  *See Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001).  We review the Commissioner's decision to determine whether it is supported by substantial evidence, but we review *de novo* the legal principles upon which the decision is based.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  "Even if we find that the evidence preponderates against the [Commissioner's] decision, we must affirm if the decision is supported by substantial evidence."  *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  Substantial evidence refers to "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Moore*, 405 F.3d at 1211.  Our limited review precludes us from "deciding the facts anew, making credibility determinations, or re-weighing the evidence."  *Id.*

16

### III.   LEGAL ANALYSIS

A disabled individual may be eligible for disability insurance benefits and social security income benefits.  42 U.S.C. §§ 423(a)(1), 1382(a)(1)-(2).  To determine whether a claimant is "disabled," an ALJ applies the five-step sequential evaluation process to determine whether the claimant:  (1) is engaging in substantial gainful activity; (2) has a severe and medically determinable impairment or combination of impairments; (3) has an impairment or combination of impairments that satisfies the criteria of a "listing"; (4) can perform her past relevant work in light of her residual functional capacity; and (5) can adjust to other work in light of her residual functional capacity, age, education, and work experience.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

In this case we are concerned with step four of this analysis, particularly whether substantial evidence supports the ALJ's assessment of Castro's residual functional capacity.  In assessing a claimant's residual functional capacity, an ALJ must consider all relevant medical and other evidence.  *See Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004).  "[T]he ALJ must state with particularity the weight given to different medical opinions and the reasons therefor."  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011).

An ALJ considers many factors when weighing medical opinion evidence, including the examining and treatment relationships between the claimant and the

treating source, whether the treating source's opinion is well-supported, and whether it is consistent with the record. 20 C.F.R. §§ 404.1527(c); 416.927(c). In general, an ALJ must give the medical opinions of a treating source "substantial or considerable weight unless good cause is shown to the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (internal quotation marks omitted). We have found that good cause existed when the opinion was not bolstered by the evidence, the evidence supported a contrary finding, or the opinion was conclusory or inconsistent with the doctor's own medical records. *Id.*

Here, Hassan, Castro's treating psychiatrist, prepared two assessment reports evaluating Castro's limitations. Although the ALJ assigned great weight to some of Hassan's opinions, the ALJ found that there was good cause to give less weight to the remainder of his opinions—including that Castro had no useful ability to demonstrate reliability or deal with work stress and a poor ability to use judgment, behave in an emotionally stable manner, and relate predictably in social situations—because they were inconsistent with the record as a whole, including her medical records. In particular, the ALJ found that Castro's medical records contradicted these opinions in three ways: (1) Hassan's treatment notes said that Castro had good judgment, insight, thought process, and thought content; (2) Hassan's treatment notes said that Castro's condition had improved; and (3) the assessment from Castro's hospital admission showed that she had good judgment

18

and comprehension.  Substantial evidence does not support any of these findings because, with respect to each purported inconsistency, a reasonable person would conclude that the record evidence was inadequate to establish a contradiction.

First, substantial evidence does not support the ALJ's conclusion that Hassan's opinions were inconsistent with his treatment notes stating that Castro had good judgment, insight, thought process, and thought content.  No reasonable person would accept the conclusion that the observations in the treatment notes contradicted Hassan's opinions.  Hassan's treatment notes reflected his observations of Castro during treatment appointments in a medical environment.  But in the assessments Hassan opined about Castro's abilities "to do work-related activities on a day-to-day basis in a regular work setting."  Doc. 13 at 554.  As other courts have recognized, "the work environment is completely different from home or a mental health clinic."  *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000).  Without more, we cannot say that Hassan's observations of Castro's judgment, insight, thought process, and thought content in a treatment environment absent work stressors were inconsistent with his assessments about the limitations she would face in a day-to-day work environment.

In response, the Commissioner argues that our precedent clearly permits an ALJ to look to whether a medical source's treatment notes are consistent with his opinions.  We agree with the Commissioner that good cause to give less weight to

19

a treating source's opinions exists when the source's opinions are "inconsistent with [the source's] own medical records." *Lewis*, 125 F.3d at 1440. The problem for the Commissioner here is that substantial evidence does not support the ALJ's conclusion that there was an inconsistency. Because the ALJ failed to identify any inconsistency, we cannot say that substantial evidence supports the ALJ's decision to give less weight to Hassan's opinions. *See id.* at 1440-41 (concluding that substantial evidence did not support the ALJ's decision to give less weight to opinions of treating physicians when the ALJ had failed to identify medical evidence that was inconsistent with the treating physicians' opinions).

Second, substantial evidence also did not support the ALJ's conclusion that Hassan's opinions that Castro continued to experience limitations were inconsistent with his treatment notes stating that her condition had improved. The ALJ's position rests on the premise that a treatment note stating that a patient's condition improved amounts to an opinion that the patient is experiencing no limitations. But we have held that a provider's treatment note stating that a patient's condition has improved is not necessarily inconsistent with an opinion that the patient continues to experience limitations. *See Sharfarz v. Brown*, 825 F.2d 278, 280 (11th Cir. 1987).

In *Sharfarz*, a treating physician opined that a patient was totally incapable of employment because he suffered from osteoarthritis with pain and limited

20

motion.  *Id.*  The ALJ gave this opinion little weight, finding that it was inconsistent with a treatment note from the same physician stating that the patient was "'significantly better.'"  *Id.*  We held that this note did not provide a "sound basis" for the ALJ to reject the physician's opinion that the patient was unable to work.  *Id.*  We explained that the statement about the patient's improvement needed to be viewed in context of the entire record, which included a treatment note from the previous appointment stating that the patient had complained of exacerbating pain and was unable to walk unless assisted by another person.  *Id.*  Given this context, we concluded that there was no contradiction between a treatment note stating that the patient was doing "significantly better" and the physician's ultimate opinion that the patient was unable to work.  *Id.*

Although *Sharfarz* involved a provider's assessment of a patient's physical condition, the analysis applies with equal force when a provider opines about a patient's limitations due to a mental health condition.  After all, a provider's treatment note that a patient improved after receiving psychological treatment or medication may not necessarily contradict an opinion that the patient continued to face limitations because "[t]here can be a great distance between a patient who responds to treatment and one who is able to enter the work force."  *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011).  When the medical evidence shows that a patient's condition fluctuated, "any single notation that a patient is feeling better or

21

has had a 'good day' does not imply that the condition has been treated." *Id.* at 740; *see also Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001) ("That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace.").

We cannot say that substantial evidence supports the ALJ's conclusion that the treatment notes stating that Castro had improved contradicted Hassan's opinion that she continued to experience limitations. Viewed as a whole, the objective medical evidence showed that Castro's condition fluctuated. For example, at one appointment, she reported worsening depression, and Hassan noted that her levels of anxiety and depression had increased. At her next appointment, Castro reported that she was still nervous, anxious, and depressed. But Hassan also wrote in his treatment notes that she had significantly improved as compared to her previous appointment. No reasonable person would accept Hassan's statement noting significant improvement as adequate to support a determination that her depression and anxiety had been treated or that she no longer faced limitations. Indeed, just a few months later, Hassan noted that Castro's depression had worsened again and that her activities of daily living had declined. Given these fluctuations, substantial evidence does not support the ALJ's conclusion that Hassan's notes stating that

22

Castro had improved were inconsistent with his opinions that she continued to experience limitations due to her depression and anxiety.

Third, substantial evidence does not support the ALJ's conclusion that Hassan's opinions were inconsistent with records from the hospital where Castro was admitted with complaints of suicidal ideation. The ALJ found that Hassan's opinion that Castro had a poor ability to use judgment was contradicted by hospital records indicating that she had good judgment and comprehension.

A closer look at the hospital records shows no inconsistency. The hospital physician determined that Castro had good judgment and comprehension because she was able to explain why people say hello to a cashier at a store. Viewed in context, the physician was offering an opinion about Castro's ability to exercise judgment or comprehension to determine whether, after reporting suicidal ideation, she should be admitted to the hospital or released. No reasonable person would accept this assessment as adequate to support a conclusion that Castro would exercise good judgment or comprehension in a work environment. Given this context, we find substantial evidence does not support the ALJ's conclusion that the hospital physician's notes contradicted Hassan's opinion that in a work environment she would have a poor ability to use judgment. *See Lewis*, 125 F.3d at 1441.

23

Because Hassan was a treating provider, the ALJ was required to give his opinions great weight unless good cause existed. Although the ALJ found good cause based on contradictions between Hassan's opinions and the medical evidence, the ALJ's findings are not supported by substantial evidence. Because the ALJ erred in assigning these opinions less than great weight, the case must be remanded for the Commissioner to assess the weight to be given to Hassan's opinions.[9]

## IV.    CONCLUSION

For the reasons stated above, we reverse the judgment of the district court and remand with instructions to remand to the Commissioner.

**REVERSED AND REMANDED.**

---

[9] The ALJ identified a second reason for giving less than great weight to one aspect of Hassan's opinion in his first assessment—that Castro had no ability to function independently—finding that this opinion was contradicted by Castro's statements about the activities that she could perform. On appeal, Castro argues that substantial evidence also did not support this determination. Because we conclude that the ALJ erred in its finding that good cause existed to give less weight to Hassan's opinions, including this one, on the basis that they were contradicted by medical evidence, we do not reach this issue.

Castro also argues on appeal that the ALJ erred in assigning greater weight to the opinions from the two state agency consultants. Because the case must be remanded to the ALJ, we do not reach this issue.

24